Katherine Ann WILEY, by next friend, David Wiley, and wife, Anna Wiley, Plaintiffs,

v.

John P. FRANKLIN, Conley R. Young, Mrs. C. M. Hooper, Rev. H. H. Battle, John David Kling, James L. McClanahan, E. S. Proctor, Jr., Members of the Board of Education of the City of Chattanooga, Tennessee, and the Board of Education of the City of Chattanooga, Tennessee, Defendants.

Nancy SCHWARTZ, by next friend, Jack Wilkinson and Leah Mary Franke, by next friend, Robert E. Franke and wife, Dorothy Franke, Plaintiffs,

v.

James L. DOBSON, Jr., H. D. Duggan, Robert L. Frederick, James W. Hartley, John K. Witherspoon, Mrs. Helen W. Perry, Fred R. Skillern, Members of the Board of Education of Hamilton County, Tennessee, and the Board of Education of Hamilton County, Tennessee, Defendants.

Nos. CIV–1–78–1, CIV–1–78–2.

United States District Court, E. D. Tennessee, S. D.

Feb. 9, 1979.

John L. Alley, Hixson, Tenn., for plaintiffs.

Eugene N. Collins, City Atty., Randall L. Nelson, Asst. City Atty., Ward Crutchfield, Asst. County Atty., Robert Kirk Walker, David B. Kesler and Frederick L. Hitchcock of Strang, Fletcher, Carriger, Walker, Hodge & Smith, Chattanooga, Tenn., for defendants.

OPINION

FRANK W. WILSON, Chief Judge.

These are actions for declaratory and injunctive relief based upon alleged violations

by the defendants of the plaintiffs rights under the provisions of the First Amendment of the United States Constitution which declare that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . ." as that Amendment is made applicable to the states through the Fourteenth Amendment. More specifically, it is contended that the defendant Boards of Education of Chattanooga and Hamilton County, Tennessee, and their membership are violating the plaintiffs' rights to religious freedom by permitting and sponsoring a course of Bible study and instruction in the City and County elementary schools. The cases present substantially identical issues of fact and law and have therefore been consolidated for trial. The trial of the cases was held before the Court sitting without a jury. A total of 67 witnesses testified in the course of the trial and a number of exhibits were offered. Included among the witnesses were certain of the plaintiffs, other elementary students and their parents, all members of the respective school boards, all teachers currently teaching Bible courses in the City and County elementary schools, various school officials and principals, certain members of an organization known as the "Public School Bible Study Committee" and some six witnesses who were tendered as having experience or expertise in matters relating to the teaching of the Bible in the public schools.

The minor plaintiffs in these lawsuits are each students in either a City or a County elementary school. Katherine Ann Wiley is a third grade student attending Hixson Elementary School, a City school.[1] The plaintiffs, David Wiley and Anna Wiley, are the parents of Katherine Ann Wiley. Nancy Schwartz and Leah Mary Franke are each fifth grade students attending County elementary schools. The plaintiffs, Robert Franke and Dorothy Franke, are the parents of Leah Mary Franke. The plaintiff, Jack Wilkinson, is the step-father of Nancy Schwartz. Nancy Schwartz is presently enrolled in the Bible study course at McBrien Elementary School. The plaintiff, Leah Mary Franke, presently attends the Thrasher Elementary School, where she is not enrolled in the Bible study course.

The individual defendants are each members of the respective school boards and are sued in their capacity as such. Subsequent to the filing of this lawsuit the respective school boards were added as parties defendant pursuant to the decision of the United States Supreme Court in the recent case of *Monell v. Dept. of Social Services, City of New York,* 436 U.S. 658, 56 S.Ct. 611, 56 L.Ed.2d 611 (1978).

### The Bible Study Courses

Bible study courses have been offered in both the Chattanooga and Hamilton County elementary schools for a number of years. It appears that the courses were first offered in 1922 upon the initiative of a citizens group who agreed to fund the payment of Bible teachers' salaries (Ex. # 6). Over the years the citizens sponsoring group has organized itself into a committee known as the "Public School Bible Study Committee," hereinafter referred to as the "Bible Study Committee," a voluntary citizen organization that raises funds for the payment of Bible teachers, sponsors teacher selections and assignments, prepares the Bible study curricula, and conducts teacher training courses. Bible teachers are assigned to the various schools and are paid directly by the Bible Study Committee but are subject to supervision and removal by the principals of the schools in which they serve. The Bible study curricula prepared by the Bible Study Committee is subject to final approval by the respective school staffs. While no particular religious commitment appears to have been officially required for membership in the Bible Study Committee or on its Board of Directors, such membership appears both in the past and at the present to consist principally, if not entirely, of persons who identify themselves with the

---

1. Bible courses are not being taught at the Hixson Elementary School during the current school year due to lack of classroom space. Such courses were taught at the school during previous school years.

Christian religious faith and with Protestant evangelical churches within that faith. While the Bible Study Committee is not officially sponsored or directed by any particular Christian church or denomination, some churches do make financial contributions to the Committee and both ministers and lay persons from Protestant Christian churches are active in the management and direction of the Bible Study Committee. Among other sources of revenue the Bible Study Committee solicits "Love Offerings" from the parents of those children who participate in the Bible study classes (Ex. # 24). The Committee raised and expended in excess of $230,000 in financing the public school Bible study courses in 1977 (Ex. # 10). It is the purpose of the Committee to finance the Bible study courses without the necessity of any public funds being expended and it has accordingly undertaken the financial obligations incident to the defense of this litigation. The evidence reflects no identifiable expenditure of public funds as having been used in the Bible study program other than those incident to the use of school classroom space and such supervisory time as may be necessary in scheduling and assigning classroom space and monitoring courses.

Each member of the respective school boards stated in the course of his or her testimony that it was the intent and purpose of the board in making available Bible study courses in the elementary schools to confine such instructions to those of a literary, historical or other non-religious nature. The intent of the City school board in this regard as set forth in its policy statement is as follows:

"In the study of the heritage of America, which is a significant facet of the instructional program for Chattanooga Public Schools, the Bible is considered in its relations to history, literature, and social thought. The teaching of Bible as religious doctrine, however, is not viewed as the prerogative of schools, since the public schools serve students of many religious backgrounds. Therefore, in consideration for the total school program, the laws governing religious freedom, and the right of every individual to exercise free choice in such matters without personal embarrassment to himself or his family, Bible may be offered as an elective subject but not as a requirement." (Ex. # 5)

The intent of the County school board as set forth in its policy statement is as follows:

"The *Rules, Regulations and Minimum Standards* of the Tennessee State Board of Education sets forth as two of the goals for education in this state that the students gain 'knowledge and appreciation of the history of the community, state, nation, and world,' and 'knowledge of a variety of moral and ethical values and use of this knowledge for establishing a personal value system free from bias and prejudice.' In studying American heritage in Hamilton County Schools, the Bible is presented in relation to its place in the origin of the republic, the establishment and development of the public education, the emphasis on individual worth, and its pervading influences in the country's government, history, and the very fabric of American society." (Ex. # 1)

During the 1977–78 school year and in previous school years the policies governing the offering of Bible study courses, as approved by the respective school boards, provided that such courses were to be elective only and that students were to be enrolled only upon the written request of their parents. The giving of grades was to be optional with the Bible teacher, but such grades were in no event to be a part of the student's academic record (Ex. # 1 & # 5). Students not enrolled in Bible classes were to remain in the regular classroom and be under the instruction and supervision of the regular classroom teacher. Pursuant to these policies, Bible study courses were offered during the 1977–78 school year in all 50 of the City and County elementary schools. Of a total enrollment of 21,356 elementary students in the two school systems, a total of 19,924 students were enrolled in Bible study courses during that school year. The classes were taught at

each grade level in a thirty-minute classroom session each week for a total of thirty-two weeks during the school year, thus providing a total of eight hours' classroom instructions each semester or sixteen hours each school year.

Under the procedures followed prior to the present school year it appears that a number of Bible courses were taught in the regular classroom even though this was not in accord with Board policy and even though in a few instances some students in the class might not have elected to take the course. In such instances students not enrolled for the course were required to leave the room and go to another class or to the library or elsewhere. It further appears that such non-electing students were often given "make work" assignments or were otherwise omitted from any meaningful classroom assignment or supervision. Following the filing of this lawsuit and upon advice of their trial counsel, and in an effort to correct these matters, the respective school boards approved modifications to their policies governing the offering of Bible courses during the current 1978–79 school year. These modifications require an affirmative written election by the parents before a child may be enrolled in a Bible class and expressly eliminate the need for any action upon the part of parents not desiring that their child be so enrolled. Bible classes are in every instance to be taught in a classroom other than the student's regular classroom (Ex. # 5) with programs and activities of educational worth being carried on by the regular classroom teacher for students not in Bible classes. Only one-half of those students whose parents have elected for them to take a course in Bible instruction are to receive such instructions in any one school semester, thus assuring that students whose parents do not elect for them to take Bible will at all times remain in the regular classroom with a majority of their fellow students. These modifications have had the consequence of reducing Bible classroom instruction at each grade level by one-half during the current school year as the Bible instruction now received by students in any

school year will consist of only one semester of 16 weekly classroom sessions, each session being of one-half hour duration.

Although Bible teachers are subject to supervision and, if appropriate, removal by school principals and other school supervisory personnel, the selection of such teachers is made by the Bible Study Committee staff director and a three-person panel consisting of two ministers and a lay person. No fixed standards appear to have been established for the selection of such teachers other than that they have previously taken Bible study courses either in religious or secular schools or colleges. Although it is denied that any sectarian religious test is applied in selecting Bible teachers, the Bible Study Committee director testified that in interviewing prospective teachers she did inquire as to whether they had a "love of God". Unlike regular teachers, but similar to substitute teachers within the school system, Bible teachers are not required to have teacher certificates. At the present time the State of Tennessee does not have certification standards at the elementary level in the specific subject of Bible instruction. The majority of the 18 teachers presently teaching Bible courses in elementary schools appear to have had some college training. A few are college graduates. Two or three have teacher's certificates either in Tennessee or in other states. All come from a Protestant Christian background and are currently members of Protestant Christian churches. Most of them have now taught Bible for more than five years in the City and County schools, and some have taught as much as 25 years. Teacher workshops are conducted by the Bible Study Committee with the basic instruction at such workshops being that:

> "We are to let the Bible speak for itself. Under no circumstances are we to try to give a slant toward any denomination. No sectarian doctrines or church rituals or creeds are to be taught. Criticism is not to be made of anyone's faith or religion. The Bible alone is to be taught without interpretation." (Ex. # 13).

Although there appears to be no requirement that any particular translation or version of the Bible be used by teachers, the King James version has been most frequently used. The students are not provided with a Bible, nor are they required to obtain one, although in the upper elementary grades, after acquiring reading skills sufficient to enable them to read the Bible, they are sometimes requested to bring a Bible to class for that purpose.

To provide teacher guidance and to assure lesson uniformity in the various grades, the Bible Study Committee has prepared a curriculum and has provided Bible teachers instruction and supervision in the use of that curriculum. The curriculum in use at the time this lawsuit was filed, and which was last revised in 1975, initiated each lesson with one or more verses from the Bible, stated a lesson title and give Biblical references for the lesson. In the upper grades verses for memorization were recommended, the memory verses often appearing to bear no relevance to the subject matter of the lesson. At the kindergarten level the lesson titles were organized in alphabetical order. Each year lessons were taken from both the Old Testament and the New Testament, with the lessons progressing in somewhat the order of the books of the Bible.[2] Demonstrative story-telling techniques appropriate to the grade level were recommended.

2. The following nine lesson titles selected from the initial, middle and concluding lesson titles at various grade levels are illustrative of that which has been taught in the elementary grades in recent school years:
KINDERGARTEN: Animals and Man; Bible—God's Book; Cain and Able; Noah; Obadiah; Picnic with Jesus; Queen Esther and King Xerxes; Young Helpers; and Zacchaeus.
FIRST GRADE: Bible; Creation of World; Creation of Animals and Man; Jesus—Age 12 in Temple; Four Fishermen; Deaf Man Healed; Joseph; Joseph; Joseph.
SECOND GRADE: Bible; Creation; Creation; Christmas; Review; Death of Moses; Call of Joshua; David Annointed; David and the Giant; and Jonathan and David.
THIRD GRADE: Bible; Creation; Review David; Jesus at Twelve; Call of the Disciples; Feeding 5000; Esther; Esther; and Return from Captivity (Portions of Ezra and Nehemiah).

Subsequent to the filing of this lawsuit but prior to the trial a new curriculum for elementary school grades was developed by the Bible Study Committee and approved by the respective school boards. The old curriculum, as hereinabove described and as utilized in previous school years, has now been withdrawn from use and the new curriculum is in use for the current school year, 1978–79. It is further represented by the defendant that all future Bible course instructions will be in accordance with the new curriculum as the same may from time to time be revised. The new curriculum was prepared under the guidance and supervision of John Barton, a public high school English teacher and Bible instructor in the Santa Monica, California, public school system. In addition to his educational background and experience in teaching English and literature in public schools, Mr. Barton holds a master's degree in theological studies from Harvard University Divinity School and has had prior experience in the preparation of curricula for Bible study courses in public schools in California and elsewhere. He also has had experience in the selection, instruction and training of teachers of such courses.

The format of the new curriculum is patterned after that in general use in other city and county elementary school subjects. Prefatory remarks to the new curriculum summarize its objectives as follows:

FOURTH GRADE: Introduction; The Bible God's Holy Word; Creation of the World; Jacob at Haran; Jacob Returns Home; Joseph the Slave; God's Power Through Moses; God's Deliverance Through Moses; and God's Path Through the Red Sea.
FIFTH GRADE: Introduction-Bible; Review of the Fourth Grade from Creation to Joseph; Review of the Birth of Moses to the Red Sea; Crossing the Jordan; Jericho; Ai—Joshua; Saul Found Dead—David is Made the New King; David Disobeys God's Laws; Absalom Betrays His Father.
SIXTH GRADE: Introduction—The Bible; Review—Ten Commandments to King Saul; Review—Saul—David; Esther—The Beauty Queen; Esther Saves Her People; God's People Return to Their Land (Portions of Ezra and Nehemiah); Peter's Denial and Judas' Sad End; Trial and Crucifixion; Resurrection and Appearances.

## OVERVIEW

\*   \*   \*   \*   \*   \*

The Bible Study program of the Chattanooga and Hamilton County elementary schools should help students to gain a greater appreciation of the Bible as a great work of literature in itself and to understand better the countless works of literature, art, and music which allude to Biblical content. The program should also help to give students greater insight into the many historical events recorded in the Bible and into the many social customs upon which the Bible has had a significant influence.

\*   \*   \*   \*   \*   \*

## PURPOSE OF THIS GUIDE

It is the purpose of this curriculum guide to lay a foundation for equipping the teachers and supervisors of the Public School Bible Study program of Chattanooga and Hamilton County with suggested objectives, methods, and materials, that will serve as a stimulus in promoting study of the Bible in the elementary grades for its literary, historic, and sociological qualities.

Attention has been given in planning to the varying range of skills of the students at each grade level (*i. e.*, degree of comprehension and attention span). Accordingly, a variety of approaches has been suggested for implementation, including story-telling, reading, flip charts, flannel graphs, flash cards and other visual aids. Where academically appropriate, instructors are encouraged to utilize other creative techniques to supplement the approaches suggested above.

\*   \*   \*   \*   \*   \*

3. The general format of the curriculum in this regard may be illustrated by reference to the introductory statements and initial lesson plan for the kindergarten series:

### KINDERGARTEN

I. Objectives

   A. The students are learning that the Bible is a book which has had a great influence on literature, history and our culture.

## COURSE OBJECTIVES

A. The students are being introduced to Biblical accounts which familiarize them with some of the major characters, stories, settings, and circumstances in the Bible.

B. The students are being exposed to works in literature, art, and music which are either based on or allude to some Biblical content.

C. The students are being prepared for a more significant appreciation of secular, cultural works they may encounter in the upper grades.

D. The students are learning about some of the values which have influenced our culture that are of Biblical origin.

E. The students are gaining the potential for a greater understanding of important, contemporary events (such as the Middle East conflict and major archaeological discoveries). (Ex. # 2)

There follows for each grade, kindergarten through the Sixth grade, a series of sixteen lesson plans. The initial lesson in each grade level consists of an introduction to the Bible. The next ten lessons are drawn from the Old Testament and present stories of Biblical personages, characters and events in substantially the order of their appearance in the Bible. The next four lessons are drawn from the New Testament and deal with the life, times and teachings of Jesus. A final lesson is upon some miscellaneous Biblical theme drawn from various portions of the Bible.

The curriculum states objectives and teaching methods for each series of lessons, then lists lesson titles, Biblical references and lesson emphasis for each lesson.[3]

   B. The students are being familiarized with a variety of major stories and characters from the Bible.

II. Methods

   A. By far, the predominant method of learning at this level involves story-telling. If the students' first academic exposures to the Bible are to be meaningful, teachers should help them "see," "hear," and "feel" something in the reading.

Suffice it to say that the general purpose and design of the new curriculum appears to be to provide students with a knowledge or awareness of the better known and more familiar Biblical characters, stories, settings and events that are often referred to in secular literature, history and social commentary or which provide themes for some of the better known works of music and art in the Western world.

As regards the actual classroom teaching, methods, objectives and substance, the trial record would appear to reflect that Bible teachers in the elementary schools have heretofore followed rather closely the prevailing curriculum plans, materials and suggestions. While the theme often repeated throughout the testimony is that Biblical interpretation is avoided and Bible teachers "let the Bible speak for itself", in actual classroom practice it appears that mere reading of Bible verses and passages is held to a minimum, with teachers devoting most of the classroom time to telling Biblical stories, picturing Biblical characters, and reciting Biblical events relevant to the lesson subject. Biblical story-telling by a teacher in her own style and manner appears to be the hallmark of classroom instruction. The religious nature of Biblical writings and the religious beliefs and practices of Biblical personages appear to be taught and discussed. However, any personal commitment to these beliefs and practices as well as any discussion of the religious beliefs and practices of students or of their parents, families or others appear to be avoided. Likewise, diverse Biblical interpretation and Biblical criticism appear to be avoided.

In the course of the trial of these lawsuits the parties have each introduced the testimony of witnesses whose academic backgrounds and professional experience qualified them to express opinions on various aspects of the lawsuit. The consensus of the testimony of such witnesses offered upon behalf of the plaintiffs was that their examination of the curriculum and other publications issued by the Bible Study Committee caused them to form such opinions

B. Bible stories can also be made more vivid by utilization of visual aids. Particularly appropriate for this grade level are flannel graphs, flash cards, and flip charts.

III. Implementation

A. Lesson 1—The Bible: Introduction

1. Reference: See a Bible dictionary or Bible encyclopedia for background information on this subject.

2. Emphasis: on the fact that the Bible is a book containing many stories about people and events which have had a great influence on the history of the world and particularly on the lives of the people of this country.

An illustrative list of lesson titles taken from the initial, middle and concluding lesson titles as set forth in the new curriculum is as follows:

KINDERGARTEN: The Bible: Introduction; The Creation; Isaac and Rebekah; Samuel and Eli; David and Goliath; Elisha and the Widow and/or Elisha and Naaman; The Good Samaritan; The Lost Sheep; Blind Bartimeus.

FIRST GRADE: The Bible: How It Came to Be; The Creation: Part I; The Creation: Part II; Noah; Abraham: Journeys to Canaan; Abraham: Journey into Egypt; Jesus and the Ten Lepers and/or Jesus and the Paralytic; The Feeding of 5000; Family Relationships.

SECOND GRADE: The Bible: Translations and Versions; Hagar and Ishmael/The Birth of Isaac; The Binding of Isaac; Jacob at Haron; Jacob's Return; Joseph: Childhood; Zaccheus; The Nobleman's Son and/or Jairus' Daughter; Obedience to the Law.

THIRD GRADE: The Bible: Its Languages and Words; From Genesis to Exodus (review); Moses: Birth and Childhood; Moses: The Red Sea and The Wilderness; Moses: The Ten Commandments; Moses: The Tabernacle and the Golden Calf; The Prodigal Son; The Pharisee and the Publican and/or The Rich Fool; Love.

FOURTH GRADE: The Bible: Archaeology, Geography, etc.; Deborah and Barak; Gideon; Saul Becomes King; Saul and the Amalekites; David Annointed King; David and Goliath; The Crucifixion; The Resurrection; Commitment to One's Beliefs.

FIFTH GRADE: The Bible: Literary Types; The Reign of David; Solomon Becomes King; Destruction of Jerusalem and the Temple/the Dispersion; Ezra and Nehemiah; Esther; The Temptation in the Wilderness; The Sermon on the Mount; The Early Christian Church.

SIXTH GRADE: The Bible: The Intertestamental Period; Proverbs; Ecclesiastes Daniel: Part I; Daniel: Part II; Jonah; The Woman at the Well; Mary, Martha, and Lazarus; The Final Judgment.

In conclusion it should be noted that the new curriculum omits the use of memory verses.

as (1) that such materials suggest a strong religious motivation upon the part of the Bible Study Committee and reflect a conservative evangelical Protestant Biblical interpretation; (2) that the Bible Study Program in the elementary schools is lacking in desirable academic qualities, such as teacher certification and methodology of teaching; (3) that the materials examined would reflect that the Bible course instructions given in the elementary schools are impermissibly religious in nature; and (4) that historical and literary Biblical instruction in the public schools is desirable when presented in a legally and academically sound manner.

Upon the other hand, the consensus of the testimony of the expert witnesses offered upon behalf of the defendants was (1) that the revised curriculum and instruction methods currently in use assure a secular course in Biblical instruction from a literary historical and social point of view that is highly relevant to the students' understanding and appreciation of Western culture and values in general and of secular literature, art, music and history in particular; (2) that the teaching methodology of Biblical story-telling is the academically appropriate method for teaching a Bible course in the elementary grades; and (3) that courses in Bible in the elementary grades, when taught from a literary, historical and sociological point of view, are both legally permissible and educationally desirable.

While the opinions of the above referred to witnesses who are both trained and experienced in the academic field generally and in Biblical instruction in particular are helpful to the Court, the value of the testimony of each such witness is somewhat limited by the fact that none of the expert witnesses had available for his or her examination the actual classroom instructions being given nor the testimony of witnesses having knowledge of such actual instructions. Moreover, to the extent that the testimony of the foregoing expert witnesses is addressed to that which is academically desirable, as distinguished from that which is Constitutionally permissible, the testimony

goes beyond the appropriate function and role of the Court in this litigation. With these limitations in mind, the Court has duly considered the testimony of the expert witnesses in arriving at the summary of relevant facts as heretofore stated and will further consider such testimony in arriving at its legal conclusions.

## Legal Guidelines

Before proceeding to a further consideration of the contentions of the parties to this lawsuit, it is appropriate for the Court to review the relevant provisions of the First Amendment and the decisions of the United States Supreme Court interpreting and construing those provisions as they apply to the facts and circumstances of this lawsuit. Before undertaking such a review one comment would appear appropriate. It would seem neither necessary nor relevant for this Court to here undertake a justification or defense of the religious freedom clauses of the First Amendment. History and other authorities have long since made that justification and that defense far more effectively and far more eloquently than this Court is capable of doing. Suffice it to say that in a nation composed of people from many cultures, many ethnic backgrounds, many national origins, and many religious faiths, and in a nation committed to freedom of conscience, freedom of belief and freedom of religion, in a nation whose proud motto is *"e pluribus unum"* and whose proud heritage are these freedoms, every citizen should feel that he or she has a personal stake—a personal religious stake—in the preservation of these freedoms not only for themselves and those of like belief or faith, but equally for those of other faiths or other religious beliefs.

There are two clauses in the First Amendment that deal with the subject of religion. The Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibit the free exercise thereof . . ." Lay persons often refer to the first of these two clauses as requiring "Separation of Church and State" and to the second as assuring

"Freedom of Religion". A more accurate summarization and abbreviation of the clauses, and that used within the legal community, is to refer to the first clause as the "Establishment Clause" and the second as the "Free Exercise Clause". The parties to this litigation seek to raise issues and assert contentions under each of the clauses. Accordingly, it is essential to an understanding and resolution of the issues in these lawsuits to bear in mind the double aspects of the First Amendment provisions with regard to religion, that is, to comprehend not only the interrelationship of those clauses but also the difference between the clauses. A summary statement of that difference would be to say that the Establishment Clause forbids the Government from performing or aiding in the performance of a religious function, whereas the Free Exercise Clause forbids governmental restrictions or impediments upon the religious beliefs and, with certain qualifications, upon the religious practices of the individual. However, to more fully comprehend the distinct meaning, purpose, scope and interrelationship of the two clauses it will be necessary to undertake a review of the controlling case law.

At the outset it should be noted that, while the wording of both the Establishment Clause and the Free Exercise Clause purports to restrict their application to the United States Congress, it is now well settled that these clauses are made applicable by the Due Process Clause of the Fourteenth Amendment to the states and to governmental agencies of the State, such as the defendant school boards. As stated in *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940),

"The fundamental concept of liberty embodied in that [Fourteenth] Amendment embraces the liberties guaranteed by the First Amendment. The First Amendment declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. The Fourteenth Amendment has rendered the legislatures of the states as incompetent as Congress to enact such laws."

To the same effect *see also Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947); *Illinois ex rel. McCollum v. Board of Education*, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948); *Abington School District v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).

In 1947 the United States Supreme Court decided the case of *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711. While upholding a program which in effect paid the transportation costs of parochial school students, the Court there nevertheless went on to state as follows:

"* * * Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person [16] can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. . . ." *Everson v. Board of Education*, 330 U.S. 1 at pp. 15–16, 67 S.Ct. 504, at pp. 511–512, 91 L.Ed. 311.

In *Illinois ex rel. McCollum v. Board of Education*, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948) the Court held invalid a program which permitted religious teachers employed by private religious groups to come into the public schools and give religious instructions to students whose parents elected for them to receive the same. The facts in the *McCollum* case are analogous to the facts in the present case. A principal difference between the cases is that in *McCollum* the instructions were avowedly sectarian and religious in nature, while a major issue in the present cases is whether the instructions given are primarily secular or religious in nature. There are also some differences in the elective and classroom

procedures followed in the respective cases. The religiosity of the courses taught having never been an issue in *McCollum*, no formal Constitutional test of this issue was enunciated by the Court. Rather, the Court simply held that the program being followed removed any "wall" between church and state as the Board of Education was giving direct help to the advancement of religion by making its facilities and students available. The fact that the courses were to be elective as well as the fact that all religions, sects and denominations were to be afforded equal instructional opportunities were found to be irrelevant to the separation requirement and therefore insufficient to satisfy the Establishment Clause.

Four years later, in *Zorach v. Clauson*, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952), the Court upheld a program in the New York City schools wherein students were released from public schools during regular school hours in order that they might receive religious instructions of their choice at other locations. Emphasizing the absence of government funds and other support in the program and the lack of any coercion upon students and their parents in electing to participate, a majority of the Court found the program to be a mere accommodation of the desires of individual students and their parents to exercise rights whose values are reflected in the Free Exercise Clause.

To the extent that the contention is made in the principal cases that a religious test has been applied in the selection of Bible teachers in the Chattanooga and Hamilton County school program, the holding of the Supreme Court in the case of *Torcaso v. Watkins*, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961) becomes relevant. There the Court unanimously invalidated on First Amendment grounds a state requirement that a person take an oath which required a belief in God in order to qualify for public employment, stating:

"We repeat and again reaffirm that neither a State nor the Federal Government can constitutionally force a person to profess a belief or disbelief in any religion." 367 U.S. at 495, 81 S.Ct. at 1683.

The case of *Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601, decided by the Supreme Court in 1962, and often referred to as the "school prayer case", involved the Constitutionality of a 22-word interfaith prayer prepared by school authorities and prescribed for use in public classrooms as a part of a daily devotional program. Concluding that "It is no part of the business of government to compose official prayers for any group of the American people to recite as a part of a religious program carried on by the government," the Supreme Court held that the drafting and sponsorship of the prayer by public school authorities violated the Establishment Clause. The Court further held that any effort to justify the prayer upon grounds that it was nondenominational in nature or that provision was made for students to be excused from the devotional exercises was to ignore the essential nature of the program's Constitutional defect, since neither the fact that the prayer may have been denominationally neutral nor the fact that it need be recited only by students choosing to do so could serve to free the program from the requirements of the Establishment Clause.

The most recent decision of the Supreme Court upon the specific issue of Bible reading in the public schools was in the case of *Abington School District v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). There in companion cases, one arising under the laws of the Commonwealth of Pennsylvania and the other arising under a rule adopted by the Baltimore School Commissioners, devotional exercises were prescribed for the opening of each day of school. The devotional exercises were to consist of the reading of verses from the Bible, without comment, and the repetition in unison of the Lord's Prayer. Student participation was to be voluntary, provision having been made in each plan for students to be excused from the devotional exercises upon request. The Court, finding in each instance that the opening exercises were religious ceremonies and were intended to be so, concluded that the statute or regula-

tion requiring the program was in violation of the Establishment Clause. In reaching this conclusion the Court had this to say:

"The test may be stated as follows: What are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion, then the enactment exceeds the scope of the legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion." 374 U.S. 203, at 222, 83 S.Ct. at 1571.

\* \* \* \* \* \*

"The conclusion follows that in both cases the laws require religious exercises and such exercises are being conducted in direct violation of the rights of the appellees and petitioners. Nor are these required exercises mitigated by the fact that individual students may absent themselves upon parental request, for that fact furnishes no defense to a claim of unconstitutionality under the Establishment Clause (citation omitted). Further, it is no defense to urge that the religious practices here may be relatively minor encroachments on the First Amendment. . . ." 374 U.S. 203, at 224, 83 S.Ct. at 1572.

\* \* \* \* \* \*

"It certainly may be said that the Bible is worthy of study for its literary and historic qualities. Nothing we have said here indicates that such study of the Bible or of religion, when presented objectively as a part of a secular program of education, may not be effected consistently with the First Amendment." 374 U.S. 203 at 225, 83 S.Ct. at 1572.

An issue having been raised in the *Schempp* case with regard to the standing of the plaintiffs to maintain the lawsuits, the Court dealt summarily with the issue by stating:

". . . The parties here are school children and their parents, who are directly affected by the laws and practices against which their complaints are direct-

ed. These interests surely suffice to give the parents standing to complain . . ." 374 U.S. 203 at 224, n. 9, 83 S.Ct. at 1572.

Although dealing with state aid to parochial schools, an issue not involved in the principal cases, the decision of the Court in the case of *Committee for Public Education v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973) is relevant to the issues here involved in that the Court there enunciated and restated a three-part test that has evolved in recent years for determining the validity of laws and public practices under the Establishment Clause. As there stated by the Court, a challenged law or practice to be valid under the First Amendment must (1) reflect a secular purpose, (2) have a primary effect that neither advances nor inhibits religion, and (3) avoids excessive entanglement between government and religion.

The foregoing decisions of the United States Supreme Court establish the following legal propositions which must guide this Court in resolving the issues in the present lawsuits:

(1) By reason of the Due Process Clause of the Fourteenth Amendment the provisions of the First Amendment which forbid Congressional legislation with respect to either the establishment of religion or the prohibition of its free exercise are equally applicable to state and local governmental bodies, including local public school boards.

(2) Public school students and their parents have standing to maintain a lawsuit challenging the Constitutionality, under the Establishment Clause of the First Amendment, of a law, regulation or program adopted by public school authorities and applicable to schools which such students attend without the necessity of an averment or showing of any coercion or impairment of their individual rights to religious freedom. Upon the other hand, such students and their parents have standing to challenge such a law, regulation or program under the Free Exercise Clause of the First Amendment only upon an averment and a showing that the law, regulation or pro-

gram operates so as to impair their individual right to religious freedom or so as to individually coerce them with respect to the practice of their religion.

(3) While a program permitting the release of students from a public school during regular classroom hours to enable them to receive religious instructions of their choice from teachers other than public school teachers and at premises other than school premises, will pass Constitutional muster under both the Establishment Clause and the Free Exercise Clause, public school authorities may not authorize or sponsor religious devotional or instructional programs, including religious programs consisting of reading from the Bible, nor may they permit the use of school facilities for such programs, as to do so would violate the First Amendment Establishment Clause.

(4) While a program that assures students and their parents a free and uncoerced election in choosing to participate or not participate in a public school course in religious instruction sponsored or permitted within a public school might well satisfy the requirements of the Free Exercise Clause, the religious nature of the course would of necessity render it Constitutionally impermissible under the Establishment Clause.

(5) The fact that a course of instruction sponsored or permitted within a public school is nonsectarian, nondoctrinal, nondenominational or otherwise religiously neutral does not prevent its being held to be in violation of the First Amendment Establishment Clause if in fact it is a course in religious instruction.

(6) The fact that a course of instruction sponsored or permitted within a public school is of minimal duration in comparison with other courses of instruction or that no identifiable public funds are expended in providing the course does not prevent its being held to be in violation of the First Amendment Establishment Clause if in fact it is a course in religious instruction.

(7) No religious test or profession of religious faith may be required in the selection of public school teachers, including teachers of Bible study courses in public schools.

(8) For a Bible study course offered in public schools to be Constitutionally permissible under the First Amendment Establishment Clause, the following tests must be met: (a) the nature, intent and purpose of the course must be secular; (b) the primary effect of the course must neither advance nor inhibit religion; and (c) the course must be offered in a manner that avoids excessive entanglement between government and religion.

(9) The First Amendment Establishment Clause imposes no Constitutional restrictions upon the offering of Bible study courses in the public schools if such courses are so planned and so taught as to constitute a secular and objective study of the Bible for its historic and literary worth.

### Conclusions

No issue is raised in these lawsuits with regard to the applicability of the First Amendment religious freedom clauses to the actions of the defendant public school authorities in sponsoring and permitting Bible study courses in the City and County elementary schools. Rather, the initial legal issue raised in the lawsuits is with regard to the standing of the various plaintiffs to maintain the lawsuits. As stated in *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962), the gist of the rule with regard to a party's standing to maintain a lawsuit is whether that party has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues . . .". In these lawsuits it is alleged that each of the minor plaintiffs is a student within an elementary school which engages in religious practices that are in violation of both the Establishment and the Free Exercise Clauses of the First Amendment. It is alleged that the minor plaintiffs and their parents or step parent are directly and adversely affected by these practices. Such allegations are, without question, sufficient to establish standing upon the part of the

plaintiffs to maintain the lawsuits insofar as violations of the First Amendment Establishment Clause are averred. *See Abington School District v. Schempp,* 374 U.S. 203 at 224 n. 9, 83 S.Ct. 1560 at 1572 n. 9, 10 L.Ed.2d 844 at 859 n. 9 (1963). The fact that the plaintiff, Katherine Ann Wiley, is presently attending an elementary school in which the Bible study course is not currently offered does not negate either her standing or the standing of her parents to maintain the lawsuit insofar as an Establishment Clause violation is averred. At the time the lawsuit was filed the course was being offered at the school which she attended. The fact that the course is not presently being offered is due to a local and possibly temporary circumstance and that is the absence of classroom space at that particular school to enable the course to be taught during the current school year. This circumstance could be altered or remedied at any time and the course reinstated.

As regards the standing of each plaintiff to assert a cause of action under the First Amendment Free Exercise Clause, each plaintiff avers that she or he is being coerced in the matter of electing or refraining from electing to take the Bible study course, a course alleged to be religious in nature. However, concededly the plaintiff, Katherine Ann Wiley, and her parents were under no such coercion at the time of the trial as the Bible study course was not being offered at the school which she was then attending and for the reason heretofore stated. The fact that she and her parents may experience such coercion in the future is not sufficient to accord these plaintiffs standing upon the free exercise issue. The defendants likewise deny standing on the part of the remaining plaintiffs to raise any free exercise issue, contending that the plaintiff, Nancy Schwartz, is currently enrolled in the Bible study course and further contending that the recently modified Bible course election procedure eliminates any free exercise problem from the lawsuit. Of course, the latter contention begs the very question sought to be placed in issue. The former contention, namely that the plaintiff, Nancy Schwartz,

is presently enrolled in a Bible study course, would not be sufficient to negate the possibility of coercion nor to deny her and her parents standing to raise the free exercise issue under the testimony in the case.

As regards the standing of the parents to maintain the lawsuit, the defendants contend that since they are designated in the caption of the case only in their capacity as next friend to the minor plaintiffs, they are without standing to maintain these actions in their individual capacity. The Court is of the opinion that this contention is without merit. It is clear from reading the body of the complaints that they seek also to assert their individual rights as parents whose children attend elementary schools which engage in the complained of religious practices.

Turning now to the merits of these lawsuits, for reasons that will hereinafter become apparent, the Court will first consider the issues and contentions of the parties as they relate to the Free Exercise Clause of the First Amendment. As previously noted, it is part of the contention of each plaintiff that the manner in which the Bible study courses have been offered in the elementary schools have resulted in both open and subtle pressures tending to coerce the students into participating in the courses and tending to coerce their parents into permitting or requesting such participation, all in violation of the plaintiffs' religious beliefs. The record does not reflect the religious beliefs of the plaintiffs other than they do not believe in "fundamentalist evangelical Christianity," which they conceive to be the substance of the Bible study courses taught in the public schools. It is averred by the plaintiffs that these pressures have arisen from various sources, including the peer pressure exerted upon the children to participate in a program in which a great majority of other students are enrolled, the pressures generated from the identification of nonparticipating students, the neglect of such students or the "make work" assignments given them, and the lack of any meaningful regular class-

room teaching, supervision, or activity during the absence of students taking the Bible study course. While the trial record fails to establish all of the above pressures with respect to any particular plaintiff in the lawsuit, it does appear that in the past each of the plaintiffs may have felt some peer pressure to participate in the Bible study course and that some family tensions may have been generated thereby. It further appears that these pressures and tensions have been related to or have impinged upon the religious beliefs of one or both of the parents.

While denying that any such pressures, tensions or coercion has occurred in the past with respect to either plaintiff, and citing such facts as that the plaintiff, Nancy Schwartz, has regularly participated in the Bible study course, that the plaintiff, Leah Mary Franke, has denied that she felt any coercion as a result of her nonparticipation in the course and the fact that no Bible study course is presently being offered in the school attended by the plaintiff, Katherine Ann Wiley, the defendants, for response to the plaintiffs' contentions, rely principally upon the modified election plan currently in effect at all elementary schools as avoiding any Free Exercise Clause issue. That plan, it is contended, by eliminating any requirement of a negative election or other action on the part of parents who do not desire their children to participate, by eliminating the identification of nonparticipating students through the mechanism of retaining a majority of the students in the regular classroom under normal academic instruction and supervision at all times, and by the requirement that the Bible study courses always be taught in classrooms other than the regular classroom, removes any possibility of pressure, coercion or tension that might affect or impinge upon the religious belief of any student or of any student's parents.

It would appear that the policies and practices currently in effect (Exhibits Nos. 1 & 5) providing as they do for an affirmative parental election on the part of parents desiring their child to take the Bible study course and avoiding any need for a negative election on the part of parents not desiring that their child take the course, providing for the teaching of the Bible study courses in classrooms separate and apart from the regular classroom and avoiding the identification of nonparticipating students by maintaining at all times a majority of the students in the regular classroom under normal academic instruction and supervision, would free the program of any element of coercion that might interfere with a parent's or with a student's free exercise of his or her religious beliefs.

However, such a resolution of the free exercise issue fails to recognize the legal dilemma created by the parties having interposed the free exercise issue in this lawsuit. Under the facts and circumstances of this lawsuit a free exercise problem could arise only where religion was being taught in the public schools. The right protected under the Free Exercise Clause is the right to exercise one's choice of religious beliefs free of any governmental interference or restraint. The freedom involved is *religious* freedom. Thus, before any free exercise issue could arise from school sponsorship of the Bible study courses, those courses must of necessity be found to be of a religious nature, a finding that would necessarily render them in violation of the Establishment Clause. The teaching of secular courses, such as secular courses in history, literature, sociology or biology, could not interfere in an unconstitutional manner with one's religious beliefs. Thus, it was held in *Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) that prohibiting the teaching of human biological evolution in the public schools of a state upon religious grounds was itself a violation of the Establishment Clause.

Accordingly, under the facts and circumstances of the present lawsuits the Constitutional issue involving the Free Exercise Clause becomes irrelevant. Rather, the only relevant Constitutional issue that exists in the lawsuits is the Establishment Clause issue. That is to say if the Bible study courses are religious in nature, as asserted by the plaintiffs, then they must

be held unconstitutional and their continuance must be enjoined, with the consequence that no free exercise issue would then exist in the lawsuits. Upon the other hand, if those courses are not religious, but rather are secular in nature, as asserted by the defendants, then the offering of the courses and the manner of their offering could not be found to interfere in an unconstitutional manner with the plaintiffs' free exercise rights.

It remains for the Court to resolve the issues raised by the assertion and denial of the parties that the policies and actions of the respective school boards in sponsoring and permitting the teaching of the Bible study courses in the City and County elementary schools are in violation of the First Amendment Establishment Clause. This in turn requires that the Court apply to the facts of these cases the various Supreme Court guidelines heretofore discussed, including the three-part test enunciated in *Committee for Public Education v. Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973) and other cases.

An Establishment Clause discussion of a Bible study course must begin with the premise that the Bible is a religious book, or, more accurately stated, a collection of religious books and writings which have been selected and assembled for the religious teachings and messages therein conveyed. To the believer those writings and books were themselves Divinely inspired and were assembled into the Bible under Divine guidance. Thus, to simply read the Bible without selectivity is to read a religious book and to teach the Bible literally without interpretation is to convey a religious message or teach a religious lesson. Much of the writings bearing the Biblical designation of the "Old Testament" when read and taught in the literal manner above referred to form the nucleus and basis of the Jewish religious faith. Upon the other hand, the Old Testament, when combined

with the writings bearing the Biblical designation of the "New Testament", when read or taught in the literal manner above referred to form the nucleus and basis of the Christian religious faith. These would appear to be matters upon which there is and could be no real dispute or disagreement within the record.[4]

To state these conclusions, however, is not to say that the Bible can only be read as a religious book or only taught as a means of commitment or conversion to a set of religious beliefs. Upon, the contrary, as illustrated by the fact that Biblical courses are taught in most, if not all, state universities within the Nation and as recognized by all witnesses tendered as being experts in the subject of Biblical instructions in the course of this lawsuit, including both those tendered by the plaintiffs and those tendered by the defendants, Bible study courses can be so designed and taught as not to constitute the teaching of religion and as not to violate the Establishment Clause of the First Amendment when taught in public schools. This was fully and specifically recognized by the Supreme Court in the *Abington* case, *supra,* when it stated:

> "It certainly may be said that the Bible is worthy of study for its literary and historic qualities. Nothing we have said here indicates that such study of the Bible or of religion, when presented objectively as a part of a secular program of education, may not be effected consistently with the First Amendment." 374 U.S. 203 at 225, 83 S.Ct. at 1573.

The Bible is replete with writings relevant to such secular subjects and interests as history, both ancient and modern, literature, poetry, music, art, government, social customs and practices, values, behavioral sciences, and, more generally speaking, that broad range of subjects, values, interests, and activities encompassed within the gen-

4. While certain books of the Bible, such as the books of Esther, Ruth and the Song of Solomon, convey little or no religious meaning when read or taught literally and without interpretation, interpretation and objectivity are necessary if religion is not to be the dominant theme conveyed by the reading and teaching of much the greater portion of all Biblical writings.

eralized phrase "Western civilization". To ignore the role of the Bible in the vast area of secular subjects such as hereinabove referred to is to ignore a keystone in the building of an arch, at least insofar as Western history, values and culture are concerned.

That Bible study courses can be designed for use at all public school levels, from kindergarten to college graduate level, and can be designed to avoid violation of the First Amendment religious freedom strictures cannot be doubted. That the methodology of such teaching would vary according to grade level and that there may be differences, even strong differences, among school administrators and academicians as to the more appropriate methodology to be followed at any particular grade level is a matter that addresses itself solely to appropriate school authorities and is not within the province of this Court, the Court being concerned only with the Constitutionality of that which is taught.

Thus the Constitutional issue presented in teaching the Bible study courses in the public schools is not the Bible itself, but rather the selectivity, emphasis, objectivity, and interpretative manner, or lack thereof, with which the Bible is taught. The religious freedom clauses of the First Amendment are not intended as vehicles for banning books, including the Bible, from the public schools. Nor are those clauses intended to make official censors of public school teachers and administrators. Rather, they were intended to require of them only that they refrain from religious teachings as well as that they refrain from interference with the religious beliefs of their students and patrons.

Returning to the three-part test for evaluating compliance with the Establishment Clause as those tests were enunciated by the Supreme Court in *Nyquist* and other cases, it will be recalled that these three tests are (1) whether the nature, intent and purpose of the Bible study courses are primarily secular; (2) whether the effect of the courses is either to advance or inhibit religion; and (3) whether the manner of offering the courses avoids excessive entanglement between government and religion.

Applying the first of these tests, that is whether the nature, intent and purpose of the Bible study courses are primarily secular, to the facts of the present cases, the Court is of the opinion that divergent results may be reached depending upon whether the nature of the Bible study courses as given in the classrooms corresponds with the intent and purposes of the respective school boards and school authorities and with the intent and purposes stated in the recently revised curriculum on the one hand, or whether the nature of the Bible study courses as given in the classrooms corresponds with the intent, purpose and motivation of the Bible Study Committee. From the record in these cases there can be little doubt but that the motivation of the Bible Study Committee from its inception to the present time has been a religious motivation. That its membership and leadership are without exception devoutly committed to the Christian faith and to the sharing of that faith with others cannot be doubted. That the Bible Study Committee has not only funded the Bible study courses in the public schools, but that it has also performed all of the functions incident to the sponsorship and offering of the courses other than certain minor school housekeeping functions is likewise not in dispute. That the religious experience and faith of an applicant has in each instance played a role in her selection by the Bible Study Committee as a Bible study course teacher cannot be doubted. In conclusion, it likewise cannot be doubted but that the Bible Study Committee has diligently sought to conform the Bible study courses to the religious freedom requirements of the First Amendment as that Committee understands and interprets those requirements. Any failure on its part to so conform the courses would appear to be attributable to a combination of the depth of religious commitment on the part of its membership and leadership and certain misconceptions regarding the requirements of the religious freedom provisions of the First Amend-

ment. Those misconceptions are as follows: (1) that the avoidance of denominational, sectarian, doctrinal or ritualistic differences or other areas of controversy *within* the Christian faith was that which was required for compliance with the Establishment Clause; (2) that assuring parents and students of free and uncoerced election to participate in Bible study courses was the major problem and the elimination of this problem was itself sufficient to comply with both the Free Exercise and Establishment Clauses of the First Amendment; and (3) that the limited time devoted to the Bible study courses, the limited use of public school facilities, and the lack of any identifiable expenditure of public funds in offering the courses were sufficient to render the courses in compliance with the Establishment Clause.

Under the foregoing circumstances and with the Bible Study Committee, and not the school boards, being responsible for devising the Bible study course curriculum, selecting, training and supervising the Bible study course teachers, the Court can only conclude that the evidence in the record preponderates in favor of a finding that the nature, intent and purpose of the Bible study courses as heretofore taught and as currently being taught is not primarily history, literature, or otherwise secular, but rather is of a religious nature.

For the reasons just stated, the Court must likewise conclude that the Bible study courses as taught in the elementary schools fails the second test prescribed for Establishment Clause compliance in that the evidence does preponderate in favor of a finding that the courses tend to advance the Christian religious faith and, to the extent that it does so advance the Christian faith, it tends to inhibit other religious faiths.

Finally, and again for the reasons heretofore stated in discussing the initial Establishment Clause test, the Court must conclude that with the Bible Study Committee not only funding the Bible study courses but also establishing the curriculum and selecting, training and supervising the teachers, the public school Bible study pro-

gram constitutes an excessive entanglement between government and religion.

Having concluded that the Bible study courses currently being conducted in the City and County public elementary schools violates the First Amendment Establishment Clause, the Court is charged with the responsibility of fashioning an appropriate remedy. One such remedy would be to forthwith enjoin any continuance of the program. Such a course would be in accordance with the responsibility of the Court. However, the Court is not without some judicial discretion in fashioning an appropriate remedy, nor is it limited to such a final and absolute course without first affording the defendants further opportunity for bringing the elementary school Bible study courses into compliance with the First Amendment religious freedom requirements. Judicial discretion would appear to dictate the latter course, particularly in view of the uniform testimony of all witnesses who testified upon the subject that a legally permissible secular Bible study course would be academically and educationally desirable.

Furthermore, the religious freedom problem encountered in these lawsuits is not so much with the text book being used, that is the Bible, for, as previously noted, with proper selectivity, interpretation, objectivity and emphasis innumerable secular lessons relevant to Western culture, history, literature and values can be taught without encountering any First Amendment religious freedom infringement. Nor is the difficulty here encountered so much with the recently revised curriculum currently in use, as distinguished from the old curriculum used in previous years, although some lesson subjects therein mandated would appear from their title and scriptural references to stress a predominantly religious theme and to permit a minimum, if any, secular instruction. Rather, the major Constitutionally impermissible problems here encountered relate to the action of the school boards in delegating to the Bible Study Committee, a private religiously identifiable and motivated body, not only

the funding of the program, but also the full responsibility for all other aspects of the program.

 Accordingly, the entry of an order enjoining the further continuance of the Bible study courses in the City and County public elementary schools will be stayed for a period of 45 days to enable the defendant Boards of Education to devise, adopt and submit to the Court proof of the following changes in the elementary school Bible study courses:

(1) Establish uniform minimum standards for the selection and employment of persons teaching Bible study courses in the elementary grades, which standards shall specifically exclude as a condition of selection for employment any religious test, any profession of faith or any prior or present religious affiliation.

(2) Establish a procedure for the release and replacement of all teachers currently teaching Bible study courses in the elementary grades who do not meet the minimum standards adopted pursuant to paragraph (1) above, such release and replacement to be accomplished within a period of 30 days after the Court shall have approved the uniform minimum teacher standards.

(3) Establish a plan whereby the school board or some duly designated school staff member or other school personnel shall, without participation by any nonschool person or organization, select and employ all Bible study course teachers and effect the placement, training and supervision of all such teachers.

(4) Revise the Bible study course curriculum currently used in elementary school grades so as to eliminate all lesson titles whose only reasonable interpretation and message is a religious message and which lessons are not reasonably capable of being taught within the confines of a secular course in history, literature or other secular subject matter normally included within or recognized as suitable for an elementary school curriculum.

None of the foregoing instructions shall limit or restrain the defendant school boards from entering into any arrangement they may elect with any individual or organization, including the Public School Bible Study Committee, for the funding of the elementary school Bible study courses. Nor should such instructions interfere in any way with the retention of the elective policies and practices currently in effect.

The entry of an order upon this opinion will await the submission of rules, plans, policies and curricula changes as hereinabove provided or await the expiration of the time allowed therefor without action having been taken thereon by the defendants in accordance with the Court's opinion.