**Sam L. CROCKETT and Sally A. Crockett, Plaintiffs,**

v.

**August E. SORENSON, et al., Defendants.**

Civ. A. No. 83–0064–A.

United States District Court, W.D. Virginia, Abingdon Division.

July 29, 1983.

Gerald L. Gray, Clintwood, Va., for plaintiffs.

Guy O. Farley, Warrenton, Va., for defendants.

## MEMORANDUM OPINION

KISER, District Judge.

This controversy involves the program of Bible instruction offered in the elementary schools of the City of Bristol, Virginia. Plaintiffs, Sam L. Crockett and Sally A. Crockett, are residents of the City of Bristol and the parents of Kathleen Crockett, who,

at the time this suit was filed, was a fifth grade student at the Washington and Lee Elementary School. Defendants included August E. Sorenson, Louise A. Bowdoin, Charles P. Curcio, Ralph M. Dillow, Jr., and Fred P. Entler, members of the Bristol School Board; Royce W. Quarles, the Superintendent of Schools of the City of Bristol; and Tom Parker, the Principal of Washington and Lee Elementary School.[1]

Plaintiffs bring this suit pursuant to 42 U.S.C. § 1983, alleging that the course in Bible instruction offered in the fourth and fifth grades of the Bristol elementary schools is, in fact, religious instruction and thus violative of the Establishment and Free Exercise Clauses of the First Amendment to the United States Constitution; Article I, § 16 of the Constitution of Virginia; and Virginia Code §§ 57–1 to 57–2 (1981).[2] Plaintiffs request that Defendants be permanently enjoined from continuing to teach the Bible course in the Bristol public schools and that Plaintiffs be awarded costs and attorneys' fees.

This case was tried over a four-day period. During the trial, the parties introduced evidence in the form of numerous witnesses, documentary exhibits of various kinds, and video tapes of actual classes of two of the teachers, Mrs. Luella A. Steppe and Mrs. Beverly Bowers. From this evidence, I make my findings of fact.

## I.

### FINDINGS OF FACT

1. For over 40 years, the Bristol public school system has provided classes in which the Bible has been taught in the fourth and fifth grades. These classes are taught once a week for 45 minutes in each of Bristol's six elementary schools. Students receive no grade or credit on their academic record for the classes.

2. The Bible teaching program was begun in 1941 by a private group of individu-

als. Seven years later the Bristol Ministerial Association assumed sponsorship of the program.

3. The Bristol Ministerial Association is a voluntary group of Protestant ministers in the Bristol area.

4. The Bristol Ministerial Association continued to sponsor the Bible instruction course until 1978. At that time another private group, the Bristol Council of Religious Education, began to sponsor the program. The Council was renamed Bible Teaching in the Public Schools in November, 1982. Regardless of the name change, this group has been the sponsor of the Bible instruction program from 1978 to date.

5. The membership of the Bible Teaching in the Public Schools group is composed of ministers and lay representatives from the various Protestant denominations in the City of Bristol. It is a loosely organized group which is run on a day-to-day basis by officers who are elected by the delegates from the various churches. Its primary functions are to raise funds for the Bible instruction program, to employ teachers and to supervise the instruction.

6. Early in the life of the program, the precise time not being revealed by the evidence, the Ministerial Association prepared a course of study outline and prescribed the objectives of the course, the materials to be used, and the portions of the Bible to be taught. This outline has been used by the teachers from then until the present with no substantial modifications. Although not prescribed by the Ministerial Association, the King James Version of the Bible is the translation which has been used by the teachers.

7. Since the inception of the program, the teachers of the Bible course have been selected, hired, supervised and paid by the private sponsoring group. The public school officials exercise no control or supervision over the teachers; the sole official

1. On April 5, 1983, the court granted Plaintiffs' Motion to Dismiss the Bristol Council of Religious Education as a party defendant.

2. In light of my analysis, I do not reach Plaintiffs' allegations that various Virginia constitutional and statutory sections have been violated.

duty that the teachers have to the school officials is to report attendance.

8. At the close of the 1982–83 school year, the program had three paid teachers: Mrs. Luella A. Steppe, Mrs. Beverly Bowers, and Miss Mildred Clark. Mrs. Steppe has been a teacher in the program since 1943 and retired at the end of the 1982–83 school year. Miss Clark and Mrs. Bowers have taught in the program for 35 and 3 years, respectively, and both still teach in the Bible instruction classes. All three teachers have college degrees and teaching experience in biblical and elementary education. Miss Clark has a Tennessee teaching certificate; only Mrs. Bowers holds a teaching certificate from the Commonwealth of Virginia.

9. Bible classes are offered only to students in the fourth and fifth grades of the City of Bristol school system. Classes are voluntary and to be enrolled in one of the classes, the parent(s) of the child must affirmatively request enrollment. This is accomplished by means of a form card which is sent to the parent(s) at the beginning of the school year together with an explanatory brochure. The card must be signed by the parent(s) indicating approval for the child to enroll in the class. If the parent(s) indicates disapproval or if the card is not returned to the school where the child attends, the child is not enrolled.

10. For the greatest portion of the time that the Bible teaching program has been in effect, students who did not enroll in the class were sent to the principal's office or to the library during the Bible class period. More recently, however, an attempt has been made to afford the non-participating students a more meaningful use of their time. Since 1982, the non-participants have been sent to the "extension center". The "extension center" is a redistribution plan where the student, in theory, may choose one of several options, i.e. study hall, physical education or a class in a subject at his grade level. As a practical matter, however, the student has only the choice of study hall or physical education because the subject classes offered were simply a repeat of what the student had already attended in his regular curriculum.

11. There exists a certain amount of pressure on the student to make an election to enroll in the Bible class. This is not an intentional pressure which is exerted either by the public school officials or the Bible teachers, but peer pressure which is inherent in the act of choosing a course of conduct which is contrary to the vast majority of the student's peers. For example, in the 1982–83 school year, there were 589 fourth and fifth grade students in the elementary schools of the Bristol school system and 18 elected not to take the Bible class.

This peer pressure affects students differently. To some it has a positive effect of making them feel "special", while to others, including Kathleen Crockett, it is keenly felt in a negative way of making them feel ostracized from their fellow classmates who are enrolled in the Bible class.

12. From its inception up until February, 1982, the class routine consisted of Bible teaching, prayers, and the singing of hymns. After February, 1982, the prayers and singing of hymns were dropped from the program. Presently, the classes consist chiefly of Bible teaching, although the use of non-devotional music has continued.

13. The fourth and fifth grades are appropriate levels at which to teach *about* the Bible provided the courses are structured and taught in a manner so as not to be a religious exercise. Further, with proper planning and execution, the history, content and literature of the Bible is capable of being taught primarily as an academic subject.

Where appropriate, these findings of fact and the reasons therefor will be elaborated upon later in this opinion.

## II.

### A.

Since Plaintiffs are residents and taxpayers of the City of Bristol, since their daughter Kathleen was, at the time of the filing of this suit, in the fifth grade where

the Bible instruction course is being taught, and since the complaint alleges that this program is constitutionally impermissible, they have the requisite standing to prosecute this action. *See Abington School District v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); *McCollum v. Board of Education,* 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948).

### B.

Initially, Defendants assert that since the First Amendment is not expressly applicable to the states, Plaintiffs' complaint fails to allege a violation of any federally protected right. It is much too late in the day to doubt that the First Amendment is made applicable to the states through the Fourteenth Amendment. *See Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962); *Abington School District v. Schempp, supra.* But see, *Jaffree v. Board of School Commissioners of Mobile County,* 554 F.Supp. 1104 (S.D.Ala.), *rev'd,* 705 F.2d 1526 (11th Cir. 1983).[3]

### C.

The First Amendment to the United States Constitution, in pertinent part, provides:

> Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; ...

While the meaning of this phrase may have been perfectly clear to the Founding Fathers, it has created endless discussion and litigation to this day. The Court has established some firm boundaries and has attempted to lay down certain guiding principles with respect to the First Amendment. A review of the decisions, however, might well lead one to confirm the fears of Justice Jackson that the " 'wall of separation between church and state' [might become] as winding as the famous serpentine wall designed by Mr. Jefferson for the University he founded." *McCollum,* 333 U.S. at 238, 68 S.Ct. at 478 (Jackson, J., concurring).[4]

Plaintiffs argue that the Bible course offends both the Establishment and Free Exercise Clauses of the First Amendment. If Plaintiffs prove by a preponderance of the evidence that the course violates the Establishment Clause, it will be unnecessary to determine the merits of Plaintiffs' free exercise argument. Likewise, if Plaintiffs fail to prove an Establishment Clause violation, only then would this court be required to determine whether Plaintiffs' free exercise rights are being violated. Moreover, it is possible for Plaintiffs to make out a free exercise claim even though the course does not constitute religious instruction. *See generally Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *United States v. Seeger,* 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965); *West Virginia v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). Accordingly, I will now turn to an examination of Plaintiffs' Establishment Clause claim.

### D.

The First Amendment was never intended to insulate our public institutions from any mention of God, the Bible or religion. When such insulation occurs, another religion, such as secular humanism, is effectively established.

In 1961, the Court recognized the fact that secular humanism is a religion, as much so as Buddhism or Taoism. *Torcaso v. Watkins,* 367 U.S. 488, 495 n. 11, 81 S.Ct. 1680, 1684 n. 11, 6 L.Ed.2d 982 (1961). Subsequently, in *Schempp,* the Court in reply to an argument made by Justice Stewart in his well-reasoned dissent, stated:

---

**3.** In his scholarly opinion, Chief Judge Hand has pointed out that the *Cantwell* decision was a result-oriented decision which cannot be supported by historical data. It is, nonetheless, the rule of law announced by the Supreme Court by which I am bound.

**4.** *But cf., Committee for Public Education v. Nyquist,* 413 U.S. 756, 761, 93 S.Ct. 2955, 2959, 37 L.Ed.2d 948 (1972) ("Indeed the controlling constitutional standards have become firmly rooted and the broad contours of our inquiry are now well defined".)

[i]t is insisted that unless these religious exercises are permitted, a "religion of secularism" is established. We agree of course that the State may not establish a "religion of secularism" in the sense of affirmatively opposing or showing hostility to religion, thus "preferring those who believe in no religion over those who do believe".

374 U.S. at 225, 83 S.Ct. at 1573. Clearly, the Establishment Clause can be violated in this regard without a showing of outright hostility to traditional theistic religions. Though in the context of the British university, the following quote is instructive for the situation in our public schools:

> On the fundamental religious issue, the modern university intends to be, and supposes that it is, neutral, but it is not. Certainly it neither inculcates nor expressly repudiates belief in God. But it does what is far more deadly than open rejection; it ignores Him. . . . It is in this sense that the university today is atheistic. . . . It is a fallacy to suppose that by omitting a subject you teach nothing about it. On the contrary, you teach that it is to be omitted, and that it is therefore a matter of secondary importance. And you teach this not openly and explicitly, which would invite criticism, you simply take it for granted and thereby insinuate it silently, insidiously, and all but irresistibly.

Moberly, *The Crisis in the University*, 55–56 (1949) (quoted in Whitehead & Conlan, *The Establishment of Religion of Secular Humanism and its First Amendment Implications*, 10 Tex.Tech.L.Rev. 1, 19 n. 104 (1978) [hereinafter cited as "Whitehead & Conlan"]); *See also* Note, *The Establishment Clause, Secondary Religious Effects, and Humanistic Education*, 91 Yale L.J. 1196 (1982).

The Establishment Clause of the First Amendment was intended to protect the Church from the State and the State from the Church. As Justice Douglas, speaking for the majority in *Zorach v. Clauson*, 343 U.S. 306, 312, 72 S.Ct. 679, 683, 96 L.Ed. 954 (1952), stated:

> There is much talk of the separation of Church and State in the history of the Bill of Rights and in the decisions clustering around the First Amendment. . . . The First Amendment, however, does not say that in any and all respects there shall be a separation of Church and State. . . . Otherwise the State and religion would be alien to each other—hostile, suspicious, and even unfriendly.

In *McCollum v. Board of Education, supra,* a program of religious instruction in the public schools was found to be unconstitutional. Classes were taught by representatives from Protestant, Catholic and Jewish groups. Students who did not wish to attend these classes were required to leave the classroom. The instruction was admittedly religious in nature and the Court, in finding a violation of the Establishment Clause, reasoned:

> This is beyond all question a utilization of the tax-established and tax-supported public school system to aid religious groups to spread their faith. And it falls squarely under the ban of the First Amendment . . .

333 U.S. at 210, 68 S.Ct. at 464.

Four years later, the released-time program in which students were released from the public schools during school hours to attend religious instruction classes off school property was permitted in *Zorach v. Clauson, supra.* Emphasizing the need for government to accommodate the spiritual needs of its citizens, the Court noted that no religious instruction occurred in the public school classrooms and that there was no expenditure of public funds. 343 U.S. at 308, 309, 72 S.Ct. at 681. *See also Smith v. Smith,* 523 F.2d 121 (4th Cir.1975), *cert. denied,* 423 U.S. 1073, 96 S.Ct. 856, 47 L.Ed.2d 83 (1976).

In *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), the Court dealt with the issue of prayer in public schools. In that case, the New York State Board of Regents had composed an "interfaith" prayer for use at the beginning of each day in the public schools of the state. Noting the unquestioned religious nature of prayer, the

Court invalidated the required exercise as contravening the Establishment Clause.

The next Term, in *Abington School District v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), a case involving programs of prayer and devotional Bible reading used to open the school day in Pennsylvania and Maryland, the Court concluded that the programs were religious activities, violative of the Establishment Clause. But the Court went on to state that while the programs of Bible reading were impermissible religious activities, use of the Bible in public schools was not per se unconstitutional:

> It certainly may be said that the Bible is worthy of study for its literary and historical qualities. Nothing we have said here indicates that such study of the Bible or religion, when presented objectively as part of a secular program of education, may not be effected consistently with the First Amendment.

*Schempp,* 374 U.S. at 225, 83 S.Ct. at 1573; *Accord* 374 U.S. at 300, 83 S.Ct. at 1612 (Brennan, J., concurring).

*McCollum, Zorach, Engel* and *Schempp* make it clear that religious instruction is not permitted in the public schools. On the other hand, the *Schempp* decision makes it equally clear that public schools may offer courses of Bible instruction provided they are presented in an objective manner.

Against this background, the question for decision here is whether the challenged Bible course is, as Plaintiffs contend, impermissible religious instruction, or, as Defendants contend, an objective academic course of Bible study. Determining on which side of the line any particular case falls is difficult at best. As the Court, in *Lemon v. Kurtzman,* 403 U.S. 602, 612, 614, 91 S.Ct. 2105, 2111, 2112, 29 L.Ed.2d 745 (1971), explained:

> Candor compels acknowledgement ... that we can only dimly perceive the lines of demarcation in this extraordinarily sensitive area of constitutional law.

*       *       *       *       *       *

Judicial caveats against entanglement must recognize that the line of separation, far from being a "wall", is a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship.

And, as Justice Brennan has stated:

> The fact is that the line which separates the secular from the sectarian in American life is elusive. The difficulty of defining the boundary with precision inheres in a paradox central to our scheme of liberty.

*Schempp,* 374 U.S. at 231, 83 S.Ct. at 1576 (Brennan, J., concurring).

This problem is especially acute when dealing with a course in biblical literature. No one can seriously dispute the importance of the Bible as a religious document. Both Jews and Christians derive the essence of their religious beliefs from the Bible, albeit from different portions. Thus, it is probably true that the Bible's greatest value is as a religious book rather than strictly as a source of history or literature.

Still, the Supreme Court has recognized the importance of the Bible independent of its religious significance and the influence that this book has had on Western civilization cannot be gainsaid. *Schempp,* 374 U.S. at 225, 300, 83 S.Ct. at 1573, 1612. "To ignore the role of the Bible ... is to ignore a keystone in an arch." *Wiley v. Franklin,* 468 F.Supp. 133, 150 (E.D.Tenn.1979). A few examples will illustrate this point.

In art, one cannot truly appreciate such great works as da Vinci's *Last Supper,* Michelangelo's work in the Sistine Chapel, or Albrecht Dürer's woodcuts without some basic understanding of what the Bible contains. Without some introduction to the Book of Isaiah, Handel's *Messiah* loses much of its force and importance. Literature is replete with biblical allusion. Some of the better known works which rely heavily on allusions from the Bible include Milton's *Paradise Lost;* the plays of Shakespeare, especially *Measure for Measure;* Blake's *Marriage of Heaven and Hell;* Melville's *Moby Dick;* Faulkner's *Absalom, Ab-*

salom; T.S. Eliot's, *The Wasteland;* and C.S. Lewis's, *The Screwtape Letters.*

Our language and popular culture are also replete with biblical allusions. The symbol of the American Medical Association, a staff with a serpent on it, is drawn from an episode in the Book of Numbers, when Moses, at God's suggestion, raised a bronze serpent on a staff and all the children of Israel who looked upon it were healed of snakebites. The phrase "handwriting on the wall" comes from a passage in the Book of Daniel in which handwriting on the wall foretold rough times ahead for Babylonian King Belshazzar. The popular phrase "the apple of my eye" is used in the Old Testament as one of God's descriptions for His people Israel. And, of course, the term "Armageddon" is the site where the battle will take place which will mark the end of the age, as described in the Book of Revelations.

Anglo-American law as we know it today is also heavily indebted to principles and concepts found in the Bible. William Blackstone, one of the most influential figures in the development of the common law, explained:

> The doctrine thus delivered we call the revealed or divine law, and they are to be found only in the holy scriptures. . . . Upon these two foundations, the law of

nature and the law of revelation, depend all human laws. That is to say, no human laws should be suffered to contradict these.

W. Blackstone, *Commentaries on the Law of England,* Chitty ed., p. 28 (1866) (quoted in Whitehead & Conlan, *supra,* at 26). Blackstone posited that the law of nature as well as the law of revelation, was derived from God. *Id.*

Further, biblical influences pervade many specific areas of the law. The "good Samaritan" laws use a phrase lifted directly out of one of Jesus' parables. The concept of the "fertile octogenarian", applicable to the law of wills and trusts, is in large part derived from the Book of Genesis where we are told that Sarah, the wife of the patriarch Abraham, gave birth to Isaac when she was "past age". In addition, the Ten Commandments have had immeasurable effect on Anglo-American legal development.

Moreover, we as Americans, should especially be aware of the influence that the Bible and its principles have had on the founding and development of our nation. In this regard, it is significant that President Ronald Reagan, on February 3, 1983, issued a proclamation declaring 1983 the "Year of the Bible" in recognition of the Bible's fundamental and enduring influence on our country.[5]

---

**5.** The President's proclamation is set forth below in full:

### YEAR OF THE BIBLE, 1983

#### BY THE PRESIDENT OF THE UNITED STATES OF AMERICA PROCLAMATION

Of the many influences that have shaped the United States of America into a distinctive Nation and people, none may be said to be more fundamental and enduring than the Bible.

Deep religious beliefs stemming from the Old and New Testaments of the Bible inspired many of the early settlers of our country, providing them with the strength, character, convictions, and faith necessary to withstand great hardship and danger in this new and rugged land. These shared beliefs helped forge a sense of common purpose among the widely dispersed colonies—a sense of community which laid the foundation for the spirit of nationhood that was to develop in later decades.

The Bible and its teachings helped form the basis for the Founding Fathers' abiding belief in the inalienable rights of the individual, rights which they found implicit in the Bible's teachings of the inherent worth and dignity of each individual. This same sense of man patterned the convictions of those who framed the English system of law inherited by our own Nation, as well as the ideals set forth in the Declaration of Independence and the Constitution.

For centuries the Bible's emphasis on compassion and love for our neighbor has inspired institutional and governmental expressions of benevolent outreach such as private charity, the establishment of schools and hospitals, and the abolition of slavery.

Many of our greatest national leaders—among them Presidents Washington, Jackson, Lincoln, and Wilson—have recognized the influence of the Bible on our country's development. The plainspoken Andrew Jackson referred to the Bible as no less than "the rock on which our Republic rests." To-

Secular education imposes immediate demands that the student have a good knowledge of the Bible. Two defense exhibits vividly illustrate this point. Defendants' Exhibit 14 is a summary of references to the Bible in the 1980 edition of the Scholastic Aptitude Manual, used by high school students to prepare for the Scholastic Aptitude Test (SAT), the results of which are used by most colleges and universities in the admissions process. Defendants' Exhibit 15, a summary of Bible references found in textbooks used in the Bristol public schools, is based on selected books from elementary, junior high and high school classes. Both exhibits bear witness to the overriding importance of providing our children with a basic education in the Bible.

■ In light of the above, it becomes obvious that a basic background in the Bible is essential to fully appreciate and understand both Western culture and current events. Courts must be careful not to so encumber our educators with restrictions as to what can be taught that we prevent them from providing our children with the basic learning experience they need. The Supreme Court has stated that for a course of Bible instruction to pass constitutional muster, it must be taught objectively. *Schempp, supra.* Clearly, however, absolute objectivity is not possible nor required, for as the Court stated in *Lemon,* "[o]ur prior holdings do not call for total separation between church and state; total separation is not possible in an absolute sense." 403 U.S. at 614, 91 S.Ct. at 2112.

day our beloved America and, indeed, the world, is facing a decade of enormous challenge. As a people we may well be tested as we have seldom, if ever, been tested before. We will need resources of spirit even more than resources of technology, education, and armaments. There could be no more fitting moment than now to reflect with gratitude, humility, and urgency upon the wisdom revealed to us in the writing that Abraham Lincoln called "the best gift God has ever given to man ... But for it we could not know right from wrong."

The Congress of the United States, in recognition of the unique contribution of the

### E.

Having concluded that the Establishment Clause permits a course of Bible study to be taught in the public schools, the next line of inquiry is *how* it may be taught so as to be non-violative of the Establishment Clause. In *Lemon v. Kurtzman, supra,* the Supreme Court devised a three-prong test for determining whether a given activity violates the Establishment Clause. The test is:

1. The activity must have a secular purpose;

2. The activity must have a principal or primary effect which neither advances nor inhibits religion; and

3. The activity must not foster an excessive entanglement with religion.

403 U.S. at 612–613, 91 S.Ct. at 2111.

■ The Court subsequently stated that this test does not state any new principles of law, but is rather a distillation of the Court's efforts in the past to evaluate a wide range of governmental activity. *Meek v. Pittenger,* 421 U.S. 349, 358, 95 S.Ct. 1753, 1759, 44 L.Ed.2d 217 (1975). In *Meek,* the Court pointed out that the second prong of the test was developed from the line of cases typified by *Schempp.* This three-prong analysis seems more appropriate for those governmental activities whose effect have more of an indirect than direct bearing on the establishment of religion. In this case, I do not think it is helpful to engage in an analysis involving all three prongs of the test in view of the cases such as *McCollum, Zorach, Engel* and *Schempp,* which very clearly stand for the proposition that the practice of religion in the public

Bible in shaping the history and character of this Nation, and so many of its citizens, has by Senate Joint Resolution 165 authorized and requested the President to designate the year 1983 as the "Year of the Bible".

Now, THEREFORE, I, RONALD REAGAN, President of the United States of America, in recognition of the contributions and influence of the Bible on our Republic and our people, do hereby proclaim 1983 the Year of the Bible in the United States. I encourage all citizens, each in his or her own way, to reexamine and rediscover its priceless and timeless message....

schools is a violation of the Establishment Clause. Thus, the appropriate inquiry in this case is simply whether the Bible teaching program constitutes a forbidden religious exercise (i.e., advances religion) or a permissible academic program. I conclude that the Bristol program falls on the forbidden religious exercise side of the line.

■ The principal vice I find in the Bristol program lies not in the grade level at which it is taught nor in the classroom presentation that I observed in either the courtroom demonstration by Mrs. Steppe or the video tape classes of Mrs. Steppe and Mrs. Bowers, but in the strong religious overlay that stems from the conception and management of the program by the sponsors.

In their testimony, expert witnesses for both sides agreed that an objective academic course in the Bible is necessary for a well-rounded education, but they had a divergence of opinion as to the appropriate grade level. The Plaintiffs' experts opined that the course should not be offered until high school because the cognitive abilities of elementary students did not enable them to discern between the Bible as *truth* and the Bible as a textbook. To the contrary, the defense experts held the opinion that Bible teaching is a "building block" type course and that elementary students should be taught the stories and characters of the Bible so that they can better understand their courses in literature and history at the high school level. I am persuaded that the view of the defense experts is the better one.

All of the experts on both sides, save one, were grounded and professed expertise in the fields of theology and philosophy. The only expert who had an extensive background in education was Dr. Allene Phy. Although well-versed in both literature and philosophy, Dr. Phy's major field of endeavor was education. She had an extensive background in devising curricula at all levels of education: elementary, secondary and post-secondary. Much of her teaching experience has involved training future teachers in proper educational methods. Due to

Dr. Phy's extensive educational background, I find that her opinion that the fourth and fifth grades are desirable levels at which to commence Bible teaching more persuasive than the testimony to the contrary.

As stated, I observed a demonstration by Mrs. Steppe of her lesson on the ascension of Jesus and viewed video tapes of classroom presentations of both Mrs. Steppe and Mrs. Bowers. Considering the subject matter being taught, the lessons were presented in an objective manner and the teaching methods were appropriate for the grade levels. No attempt was made by the teachers to indoctrinate the students in the tenets of any religious faith.

Nonetheless, it is clear from the evidence that the Bible teaching program was instituted as a religious exercise and has continued as such until the present. Although a stated purpose of the program is the objective teaching of the Bible, the evidence is to the contrary. The fact is that the program was originally designed to inculcate religious beliefs in the students. One would be hard-pressed to find that a program which has been in place for 40 years under the sponsorship of Protestant churches which prescribed the curriculum, selected, supervised and paid the teachers, included prayers and hymns in the classes, and which has not been subject to the control and supervision of secular authority can be an objective academic course of Bible study. Regardless of how a teacher may strive to be objective in her classroom presentation, there is no way she could overcome the perceived aura that the classes are religious in nature. Nothing short of a clean break with the past can dispel the religious nature of the program. As was stated earlier in this opinion, the Bible is a religious document and to teach it within the bounds of the First Amendment proscription is difficult under even the most ideal conditions. And the conditions which exist in the present Bible program fall short of ideal. Hence, my conclusion that the Bible teaching program in the Bristol school system is a con-

stitutionally religious activity which violates the Establishment Clause.

But this does not mean that the Bible cannot be taught in the fourth and fifth grades of the Bristol public schools under any circumstances. I think Chief Judge Dalton suggested an appropriate framework for Bible teaching in the public schools in the case of *Vaughn v. Reed,* 313 F.Supp. 431 (W.D.Va.1970). Following his lead, I believe that the Bible could be taught in a public school system under the following guidelines:

1. Supervision and control of the course should be under the exclusive direction of the Bristol School Board;

2. The School Board should do the hiring and firing of teachers for the Bible course in the same manner as it does for all other teachers;

3. Teachers should be certified in elementary education by the Commonwealth of Virginia;

4. No inquiry should be made to determine the religious beliefs, or the lack thereof, of teacher applicants;

5. The School Board should prescribe the curriculum and select all teaching materials, including the appropriate translation of the Bible;

6. The course should be offered as an elective. Children who choose not to take the course should be offered a reasonable alternative course. Decisions as to what types of alternatives are to be offered are more appropriately decisions within the province of educators rather than this court;

7. The School Board may solicit contributions from any private organization for the purpose of funding any and all costs of a Bible course. Such contributions shall be received with "no strings attached" other than the understanding that such funds may be earmarked for the Bible course exclusively; and

8. The course should be taught in an objective manner with no attempt made to indoctrinate the children as to either the truth or falsity of the biblical materials.

It will be noted that my prescription differs from the one enunciated in *Vaughn* in one important respect. In *Vaughn* the Bible course would be mandatory for all students at the grade level at which it is offered, 313 F.Supp. 433–434, whereas I would make it optional. The reasoning of the *Vaughn* court that knowledge of the Bible is a valuable facet of a student's education and, therefore, should be a required subject is compelling when viewed from an educator's point of view. I am of the opinion, however, that from a strictly constitutional analysis, requiring a student to participate in a course of Bible study when it runs contrary to his personal religious beliefs would violate the Free Exercise Clause. For this reason, I feel that such a program must be optional. *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *See also Duro v. Dist. Atty., Second Judicial Dist. of North Carolina,* 712 F.2d 96 (4th Cir.1983).

*Wiley v. Franklin,* 468 F.Supp. 133 (E.D. Tenn.1979), confronted this issue of the interrelationship of Bible teaching vis-a-vis the Free Exercise Clause. The court there concluded that as long as the Bible teaching was not religious in nature, it was not a "practice of religion" which would run afoul of the free exercise proscription. *Id.* at 148. I disagree in that I do not feel that a practice must be a religious activity in order to violate the Free Exercise Clause. To illustrate, a flag salute ceremony and military conscription are not per se religious exercises, yet the Court, in *West Virginia v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), and *United States v. Seeger,* 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965), held that requiring someone who is conscientiously opposed due to sincere religious beliefs performing these practices violates the Free Exercise Clause. I feel it would be extremely oppressive and, more importantly, constitutionally unacceptable to require a student to enroll in a Bible teaching class when the very subject

**1432**

matter being taught violated his religious beliefs.

In conclusion, I hold that the current program of teaching Bible in the Bristol school system violates the First Amendment and, therefore, must be enjoined.[6]

An appropriate Order will issue.

## ORDER

For the reasons set forth in a Memorandum Opinion filed this day, it is ADJUDGED that the Bible class program of the City of Bristol, Virginia's school system violates the First Amendment of the Constitution of the United States and it is, therefore, ORDERED that the Defendants and their successors hereby are permanently enjoined from permitting the said Bible class program to be continued to be taught in the public schools of the City of Bristol, Virginia.

It is FURTHER ORDERED that the Plaintiffs shall be entitled to recover their taxable court costs from Defendants. The question of attorneys' fees, being a collateral matter which does not keep this Order from being final, is deferred until a later date.

The Clerk is directed to strike this case from the active docket of the Court and to send certified copies of this Order to all counsel of record.

---

**6.** The term "current" as used in the context of this opinion refers to the evidence of record pertaining to the Bristol program of Bible instruction. Subsequent to trial, the City Council and School Board of the City of Bristol have adopted resolutions recommending certain changes in the overall Bible instruction program. Nonetheless, these resolutions were not part of the trial record and, for this reason, were not considered by me in this decision.