Robert P. GIBSON, etc., et al., Plaintiff,

v.

LEE COUNTY SCHOOL BOARD, etc., et al., Defendants.

No. 97–529–CIV–FTM–17D.

United States District Court, M.D. Florida, Fort Myers Division.

Jan. 20, 1998.

---

Barbara Bolton Litten, Steel, Hector & Davis, West Palm Beach, FL, Thomas R. Julin, Edward M. Mullins, Steel Hector & Davis LLP, Miami, FL, Andrew H. Kayton, American Civil Liberties Union, Foundation of Florida, Inc., Miami, FL, Elliot M. Mincberg, Judith E. Schaeffer, People For The American Way, Washington, DC, for Robert P. Gibson, Mark A. Ehman, James Boler, Sandra Boler, Kenneth Weiner, Kurt Meyering and Jill Dillon.

George E. Tragos, Law Office of George E. Tragos, Clearwater, FL, Richard Burton Bush, Kenneth L. Baker, Bush & Derr, P.A., Orlando, FL, Keith B. Martin, Lee County School District, Ft. Myers, FL, Richard Albritton, Law Office of Richard Albritton, Panama City, FL, Jay Alan Sekulow, American Center for Law and Justice, Virginia Beach, VA, Stuart J. Roth, Mark Gott, American Center for Law and Justice, Mobile, AL, David A. Cortman, American Center for Law & Justice, Lawrenceville, GA, for Lee County School Board, Douglas Santini, Lanny Moore, Sr., Bill Gross, Bruce Harter and Douglas K. Whittaker.

D. Stephen Melchior, Law Office of D. Stephen Melchior, Cheyenne, WY, for National Council on Bible Curriculum in Public Schools.

### ORDER

KOVACHEVICH, Chief Judge.

This cause is before the Court on Plaintiffs' Motion for Preliminary Injunction (Dkt.4), Request for Oral Argument (Dkt.5), Memorandum (Dkt.6), Supporting Documents (Dkts.7, 18), and Defendants' response (Dkts.19, 20).

### I. Standard of Review

■ "The grant or denial of a motion for preliminary injunction is a decision within the discretion of the trial court.... That discretion is guided by the four requirements for preliminary injunctive relief: 1) a substantial likelihood that the movants will ultimately prevail on the merits; 2) that they will suffer irreparable injury if the injunction is not issued; 3) that the threatened injury to the movants outweighs the potential harm to the opposing party; and 4) that the injunction, if issued, would not be adverse to the public interest." *Haitian Refugee Center, Inc. v. Nelson,* 872 F.2d 1555, 1561 (11th Cir.1989). The issuance of the injunction is an "extraordinary and drastic remedy" not to be granted unless the movant clearly carries the burden of persuasion to all four factors. *United States v. Jefferson County,* 720 F.2d 1511, 1519 (11th Cir.1983) (quoting *Canal*

*Authority v. Callaway* ), 489 F.2d 567, 572 (5th Cir.1974).

### II. Facts

1. At a meeting on March 26, 1996, the Lee County School Board considered offering a two-semester Bible history course in Lee County high schools beginning in the 1996–1997 school year. The first semester of the course would be titled: "Bible History: Old Testament," and the second semester would be titled "Bible History: New Testament."

2. Public opinion was sharply divided as to the new course.

3. The School Board voted to authorize the Bible History course. The announcement of the course stated that the first semester "focuses on the Bible as a historical document through an overview of significant events that have affected the people of the Old Testament." The announcement of the second semester stated that it "would help students understand the relationship between historical events and their interpretations and development of religious and ethical beliefs as described in the New Testament." The announcement did not designate textbooks or other materials that would be used to teach the class, but did specify that both parts of the course would feature "the Bible as an historical document."

4. The Lee County School Board directed the establishment of a citizens advisory committee ("Bible Curriculum Committee") at its meeting of March 26, 1996. The Committee would serve in an advisory capacity to "review the curricula the Superintendent is receiving from districts around the nation; a curriculum would then be developed to be presented to the public and the Board for another vote before adoption."

5. Each of the five members of the Lee County School Board appointed two members to the Bible Curriculum Committee, and the Superintendent appointed five additional members, creating a 15–member committee.

6. On June 20, 1996, Defendant Douglas Whittaker, Executive Director for Curriculum of Lee County Schools, convened the

first meeting of the Bible Curriculum Committee. Defendant Whittaker stated that the Committee's objective would be to recommend a curriculum for a two-part course that could be offered by January, 1997. Defendant Whittaker instructed the Committee that "[the curriculum will be limited to the Old and the New Testament, excluding all other works.]" Defendant Whittaker pointed out that the "high schools currently offer a comparative religion course [in which] other religious works may be used," and that the recommended curriculum should not duplicate that offering. The Committee agreed to meet on a monthly basis.

7. The Committee met on July 22, 1996 and on August 18, 1996. At those meetings, committee members discussed the pros and cons of curricula used in other school districts in Florida and in other areas of the country. The Committee asked the School Board staff to draft a proposed curriculum combining elements of the curriculum of the National Council on Bible Curriculum in Public Schools (NCBCPS) and a curriculum used in Marion County, Florida.

8. On September 16, 1996, Defendant Whittaker presented the Committee with a draft curriculum entitled "Bible History: Old Testament," which was prepared by School District staff members Brenda Palmer, Charles Luckey, and Jack Bovee. The Committee asked the staff to revise the draft.

9. On November 18, 1996, the Committee met and reviewed a second draft of the Bible History I curriculum. The opinions of the Committee members were sharply divided as to the propriety of the draft and as to whether teachers could be adequately prepared to teach the curriculum in a permissible manner.

10. Defendant Whittaker directed the Committee that it must present a final curriculum to the School Board by December so that the course could be offered in the second semester of the 1996–1997 school year.

11. The Committee voted to move on to consideration of the curriculum to the "Bible History: New Testament" (Bible History II). The Committee agreed to generate a majority report in favor of the Bible History I

curriculum, and a minority report objecting to the Bible History I curriculum for presentation to the School Board.

12. The objections included: 1) the 19 page curriculum is too large to be realistically covered in this class, and may become subject to an instructor's personal views; 2) students should acquire a knowledge of history, not a prescribed religion or doctrine; 3) students of certain religious affiliations, convictions or upbringing may be uncomfortable; 3) the proposed curriculum might create ill will or misunderstanding; and 5) the School Board may be exposed to expensive lawsuits, tarnishing the District's reputation and unnecessarily expending tax dollars.

13. On December 16, 1996, School Board Attorney Steven Butler advised the Committee that the Bible History I curriculum had the "potential for litigation" because 1) the title of the course was biased; 2) the course appears to teach the Bible "as an inerrant document," 3) the purpose of teaching the course appeared to be non-secular; and 4) the course teaches "a single Protestant perspective." Mr. Butler also warned the Committee that the minority report increased the likelihood of litigation.

14. The School Board issued a directive to the Committee on December 17, 1996 to continue with its work. The School Board also authorized the hiring of an outside law firm to review the constitutionality of the proposed curriculum. The School Board requested a report by March, 1997, and postponed offering the class until Fall, 1997.

15. The Committee met on January 13, 1997, and opinion continued to be divided as to the proposed Bible History I curriculum.

16. On February 3, 1997, Defendant Whittaker urged the Committee to complete its revisions of the Bible History I curriculum.

17. On February 10, 1997, the Committee met and began reviewing various drafts of the Bible History II curriculum. Opinion remained sharply divided as to what should be included and how the curriculum should be taught. The Committee met again on February 24, 1997. Defendant Whittaker instructed the Committee to work toward a

consensus, but if that could not be achieved, its next step should be to vote on the lessons to be included in the course.

18. The Committee met again on March 10, 1997. Defendant Whittaker introduced the new School Board attorney, Keith Martin, and announced that an outside law firm had been retained to provide legal advice regarding the curriculum. The Committee did not reach a consensus on the curriculum for Bible History II.

19. The Committee met again on March 24, 1997, and on April 14, 1997. Opinion remain sharply divided as to what should be included, and how certain concepts should be taught.

20. On May 7, 1997, the outside counsel of the School Board reported to Defendants on a review of the draft of the Bible History I. Melanie Gurley Keeney recommended extensive revision of the Bible History I curriculum, including the complete elimination of certain sections. Ms. Keeney warned that certain issues had the potential for overstepping permissible constitutional parameters.

21. The Committee met on May 29, 1997, and discussed Ms. Keeney's advice. At that time, Defendant Whittaker reported that only one of the high schools that had enrolled students for Bible History I had a qualified teacher.

22. On June 9, 1997, Defendant Whittaker announced that the School Board directed the Committee to conclude its work by no later than July 15, 1997.

23. In July, 1997, some Committee members wrote to the School Board and urged the School Board not to offer the Bible course devised by the Committee.

24. The Committee met again on July 14, 1997. Defendant Whittaker urged the Committee to continue its work, and to carry on in light of the "dollars spent in staff time and legal counsel." School Board Attorney Keith Martin attended the meeting, and explained his advice as to further deletions of any lessons he considered central to religious faith. Mr. Martin requested the deletion of "creation" and "Adam and Eve" from the Bible History I curriculum.

25. After the July 14, 1997 meeting, some members of the Committee met with Mr. Martin and asked him what they should do with references in the curriculum to the "resurrection." Mr. Martin advised that all such references should be stricken, and teachers should be instructed never to refer to it.

26. At the Committee meeting of July 28, 1997, Defendant Whittaker reviewed with the full Committee the numerous additional modifications that Mr. Martin and Ms. Keeney required in the curricula for Bible History I and II. The Committee declined to follow the advice of counsel.

27. The School Board met on August 6, 1997. Many speakers addressed the Board as to the Bible History curricula. After hearing public comment, the School Board voted 3—2 to adopt the Bible History I curriculum in the form that included alterations made by counsel for the School Board.

28. Because of the need for teacher preparation, the teaching of the Bible History I course was postponed until January 21, 1998.

29. The Committee continued to work on the Bible History II curriculum. Counsel for the School Board advised the deletion of certain topics and concepts, to which Committee members objected. The Committee voted to disband in light of the advice of counsel as to certain deletions in the Bible History II curriculum. Before disbanding, the Committee voted to recommend the complete adoption of the NCBCPS "New Testament" curriculum to the School Board.

30. In a letter of September 25, 1997, Ms. Keeney, outside counsel for the School Board, warned Defendant Whittaker that the NCBCPS curriculum contained segments which she concluded would be viewed as constitutionally impermissible.

31. Mr. Martin, counsel for the School Board, recommended the deletion of much of the NCBCPS "New Testament" curriculum from the Committee's draft.

32. In October, 1997, School Superintendent Harter recommended to the School Board that it adopt the unfinished work of the Committee as to the Bible History II curriculum, which included modifications suggested by counsel. Defendant Harter also

provided a copy of the NCBCPS curriculum to the School Board.

33. Ms. Keeney, outside counsel for the School Board, cautioned the School Board against adopting the NCBCPS curriculum on October 20, 1997.

34. The School Board convened on October 21, 1997 to consider adoption of a New Testament curriculum. Many speakers addressed the School Board. Public opinion remained sharply divided as to the "New Testament" curriculum. Defendant Harter advised the adoption of the hybrid staff curriculum combining the Committee's unfinished work as revised by School Board attorneys and district staff. Defendant Gross also made a motion for the School Board to adopt the NCBCPS curriculum, which was seconded. At the conclusion of the meeting, the School Board voted 3—2 to adopt the NCBCPS "New Testament" curriculum, which does not include the modifications by the Board's counsel.

35. The teaching of the New Testament curriculum will begin on or before March 30, 1998.

III. Argument

At the outset, the Court notes that it perceives no difficulty with standing or ripeness in this case. Plaintiffs are taxpayers in Lee County, and have children in the school system. Plaintiffs have an interest in seeing their tax dollars spent in a permissible manner.

A. Bible History I

1. Substantial Likelihood of Success on the Merits

As the Supreme Court has stated, "The First Amendment was never intended to insulate our public institutions from any mention of God, the Bible or religion." When such insulation occurs, another religion, such as secular humanism, is effectively established. *Crockett v. Sorenson*, 568 F.Supp. 1422, 1425 (W.D.Va.1983).

The Supreme Court has further recognized the importance of the Bible independent of its religious significance, and the influence that this book has had on Western civilization cannot be gainsaid. *School Dist. Of Abington Township v. Schempp*, 374 U.S. 203, 225, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). "To ignore the role of the Bible...is to ignore a keystone in an arch." *Wiley v. Franklin*, 468 F.Supp. 133, 150 (E.D.Tenn.1979).

As the *Crockett* Court said:

In art, one cannot truly appreciate such great works as da Vinci's Last Supper, Michelangelo's work in the Sistine Chapel, or Albrecht Durer's woodcuts without some basic understanding of what the Bible contains. Without some introduction to the Book of Isaiah, Handel's Messiah loses much of its force and importance. Literature is replete with biblical allusion. Some of the better known works which rely heavily on allusions from the Bible include Milton's *Paradise Lost;* the plays of Shakespeare, especially *Measure for Measure;* Blake's *Marriage of Heaven and Hell;* Melville's *Moby Dick;* Faulkner's *Absalom, Absalom;* T.S. Eliot's *The Wasteland,* and C.S. Lewis's *The Screwtape Letters.*

Our language and popular culture are also replete with biblical allusions. The symbol of the American Medical Association, a staff with a serpent on it, is drawn from an episode in the Book of Numbers, when Moses, at God's suggestion, raised a bronze serpent on a staff and all the children if Israel who looked upon it were healed of snakebites. The phrase "handwriting on the wall" comes from a passage in the Book of Daniel in which handwriting on the wall foretold rough times ahead for Bablylonian King Belshazzar. The popular phrase "apple of my eye" is used in the old Testament as one of God's descriptions for His people Israel. And, of course, the term "Armageddon" is the site where the battle will take place which will mark the end of the age, as described in the Book of Revelations.

Anglo-American law as we know it today is also heavily indebted to principles and concepts found in the Bible. William Blackstone, one of the most influential figures in the development of the common law, explained"

'The doctrine thus delivered we call the revealed or divine law, and they are to be found only in the holy scriptures. . . . Upon these two foundations, the law of nature and the law of revelation, depend all human laws. That is to say, no human laws should be suffered to contradict them. . . .' Further, biblical influences pervade many specific areas of the law. The "good Samaritan" laws use a phrase lifted directly out of one of Jesus' parables. The concept of the "fertile octogenarian," applicable to the law of wills and trusts, is in large part derived from the Book of Genesis where we are told that Sarah, the wife of patriarch Abraham, gave birth to Isaac when she was "past age." In addition, the Ten Commandments had an immeasurable effect on Anglo–American legal development. Moreover, we, as Americans, should especially be aware of the influence that the Bible and its principles have had on the founding and development of our nation. In this regard, it is significant that President Ronald Reagan, on February 3, 1983, issued a proclamation declaring 1983 the "Year of the Bible" in recognition of the Bible's fundamental and enduring influence on our country."

*Crockett v. Sorenson*, 568 F.Supp. 1422, 1427–1428 (W.D.Va.1983)

■ It is well settled that Bible study, "when presented objectively as part of a secular program of education, may . . . be effected consistently with the First Amendment." *Schempp* 374 U.S. at 225.

However, this Court notes that:

"The [Supreme] Court has been particularly vigilant in monitoring compliance with the Establishment clause in elementary and secondary schools. Families entrust public schools with the education of their children, but condition that trust on the understanding that the classroom will not purposely be used to advance religious view that may conflict with the private beliefs of the student and his or her family. Students in such institutions are impressionable and their attendance is involuntary.

The State exerts great authority and coercive power through mandatory attendance requirements, and because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure.

Furthermore, the public school is at once the symbol of our democracy and the most pervasive means for promoting our common destiny. In no activity of the State is it more vital to keep out divisive forces than in its schools.

*Edwards v. Aguillard*, 482 U.S. 578, 584, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987).

Plaintiffs contend that the specific curricula adopted by the Lee County School Board do not present the Bible objectively as part of a secular program of education. Plaintiffs argue that Defendants' purpose and intent in officially authorizing, offering and preparing to teach a course that teaches "Bible History: Old Testament" and "Bible History: New Testament" are to promote religion generally and Christianity specifically.

Plaintiffs argue that the primary effect of Defendants' conduct in officially authorizing, offering and teaching the above two courses is to advance religion generally, and Christianity specifically.

Plaintiffs further argue that Defendants' conduct in officially authorizing, offering and preparing to teach the above two courses fosters an excessive entanglement of the Lee County School Board with religion.

Plaintiffs contend that Defendants' conduct violates the First Amendment for the above reasons.

■ No governmental act or practice can be upheld under the Establishment Clause unless it: 1) was adopted for a secular purpose; 2) has a primary effect that neither advances nor inhibits religion; and 3) does not foster an excessive government entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). A practice or action is unconstitutional if it fails any of these tests. Plaintiffs argue that Bible History curricula adopted fail all three tests. The Court will address each curriculum separately.

■ A religious purpose alone is not enough to invalidate an act of a state legislature. The religious purpose must predominate. *Edwards v. Aguillard,* 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987). The Court has examined the parties' submissions carefully.

■ As to the curriculum for Bible History I, the Court notes that Defendants are familiar with the ruling of the District Court in *Vaughn v. Reed,* 313 F.Supp. 431 (W.D.Va. 1970), finding that the Bible could be taught in a public school system under the following guidelines:

1. Supervision and control of the course should be under the direction of the Bristol School Board;

2. The School Board should do the hiring and firing of teachers for the Bible course in the same manner as it does for all other teachers;

3. Teachers should be certified in elementary education by the Commonwealth of Virginia;

4. No inquiry should be made to determine the religious beliefs, or the lack thereof, of teacher applicants;

5. The School Board should prescribe the curriculum and select all teaching materials, including the appropriate translation of the Bible;

6. The course should be offered as an elective. Children who choose not to take the course should be offered a reasonable alternative course. Decisions as to what types of alternatives are to be offered are more appropriately decisions within the province of educators rather than this court;

7. The School Board may solicit contributions from any private organization for the purpose of funding any and all costs of a Bible course. Such contributions shall be received with "no strings attached" other than the understanding that such funds may be earmarked for the bible course exclusively; and

8. The course should be taught in an objective manner with no attempt made to indoctrinate the children as to either the truth or falsity of the biblical materials.

The Court is required to be deferential to a state's articulation of a secular purpose, [and] it is required that the statement of such purpose be sincere and not a sham. *Edwards v. Aguillard,* 482 U.S. 578, 587, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987). The Court concludes that Defendants have satisfied the secular purpose requirement by adopting a curriculum which was modified based on the advice of Defendants' counsel. Whatever the private intentions of Defendants may have been, the adoption of a curriculum ostensibly designed to teach history and not religion meets the secular purpose requirement. The Court further notes that the teachers for the proposed Bible History I class have been instructed on how and what to teach, and how and what not to teach.

■ The Court further finds that it will not be able to adequately evaluate the second and third *Lemon* requirements without some record of the classroom instruction involved in the teaching of Bible History I. As the District Court said in *Wiley v. Franklin:*

"The ultimate test of the constitutionality of any course of instruction founded upon the Bible must depend upon classroom performance. It is that which is taught in the classroom that renders a course so founded constitutionally permissible or impermissible. If that which is taught seeks either to disparage or to encourage a commitment to a set of religious beliefs, it is constitutionally impermissible in a public school setting. If that which is taught avoids such religious instruction and is confined to objective and non-devotional instruction in biblical literature, biblical history and biblical social customs, all with the purpose of helping students gain 'a greater appreciation of the Bible as a great work of literature' and source of 'countless works of literature, art and music' or of assisting students acquire 'greater insight into the many historical events recorded in the Bible' or of affording students greater insight into the 'many social customs upon which the Bible has had a significant influence,' ....no constitutional barrier would arise to such classroom instruction."

The Court concludes that Plaintiffs have not demonstrated a substantial likelihood of success on the merits as to the Bible History I curriculum. The Court denies the Motion for Preliminary Injunction as to the Bible History I class. The Court finds it unnecessary to address the other three factors, since Plaintiffs have not met the first factor for a preliminary injunction.

The Court expects that Plaintiffs will videotape the classes. This will have the effect of either confirming that the classes are predominantly history classes, and are being taught in a permissibly objective manner, or confirming that the classes are predominantly religion classes, and taught in a manner which impermissibly attempts to indoctrinate. The fact that the classes are monitored may prevent any veiled attempt to promote religion or Christianity in the guise of teaching history.

In the event that Plaintiffs continue to believe that First Amendment violations are occurring in Lee County schools, the Court urges Plaintiffs to return to this Court with tapes and transcripts which clearly and specifically identify when, where, how and why the violations occur. The Court expects Plaintiffs to remain vigilant. As the Supreme Court said in *School Dist. of Abington Tp., Pa. v. Schempp,* 374 U.S. 203, 225, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963):

"Further, it is no defense to urge that the religious practices here may be relatively minor encroachments upon the First Amendment. The breach of neutrality that is today a trickling stream may all too soon become a raging torrent; and in the words of Madison, 'It is proper to take alarm at the first experiment of our liberties....'"

The Court further suggests that Plaintiffs make the tapes available to all those who are concerned about any impermissible attempt to proselytize the high school students.

B. Bible History II Curriculum

1. Substantial Likelihood of Success on the Merits

In *Wiley v. Franklin,* 474 F.Supp. 525 (E.D.Tenn.1979), the District Court found that the account of the resurrection of Jesus Christ as recounted in the New Testament forms the central statement of the Christian religious faith. The Court further found that the only reasonable interpretation of the resurrection is a religious interpretation. The Court found it difficult to conceive how the resurrection might be taught as secular literature or secular history. This Court too finds it difficult to conceive how the account of the resurrection or of miracles could be taught as secular history. The Court notes that counsel for Defendants recommended the deletion of references to the resurrection, as well as many other modifications to the proposed Bible History II curriculum.

On October 21, 1997, the School Board voted to adopt the NCBCPS "New Testament" in its entirety, without the numerous modifications recommended by the School Board's counsel and Superintendent Harter. The teaching of the New Testament curriculum is scheduled to begin on or before March 30, 1998.

The Court notes the affidavits filed by Defendants as to the adoption of the Bible History II curriculum. Because of the high degree of public attention focused on the development of the curriculum, and because of the ongoing activities of the Curriculum Committee, the Court finds it impossible to believe that the School Board did not know what it was doing when it voted to adopt the Bible History II curriculum on October 21, 1997.

The Court finds that Plaintiffs have established a substantial likelihood of success on the merits as to the Bible History II curriculum that was adopted by the School Board. The Court notes that Defendants claim Defendants are already working on a revised curriculum. The Court can only hope that the School Board will implement the advice of its attorneys.

2. Irreparable Injury

An infringement of Plaintiffs' First Amendment rights guaranteed by the Establishment Clause, even for minimal periods of time, constitute[s] irreparable injury. *Elrod*

*v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

### 3. Threatened Injury to Movants Weighed with Potential Harm to Defendants

There is no harm to Defendants in granting the injunction as to the Bible History II curriculum. Defendants were advised of the curriculum's constitutional infirmities and chose to proceed. The inevitable consequence of the adoption of a curriculum that does not pass constitutional muster is that Defendants will have to continue investing time and money in developing a curriculum which meets constitutional limits. The Court cannot rule on the wisdom or folly of continuing to develop the Bible History II curriculum, only on its constitutionality. The harm to Plaintiffs in infringement of First Amendment rights outweighs any expenditure of time and money by Defendants.

### 4. Public Interest

The Court finds it is in the public interest to hold the School Board of Lee County to the same constitutional standards to which other school boards are held. It is an abuse of public trust when elected officials ignore established legal standards.

In closing, the Court finds that it is unfortunate that it was necessary for the Court to become involved in this dispute. Both parties have able counsel available to them, and litigation of this dispute is not the most constructive use of counsel's abilities, nor is it in the best interest of the people of Lee County. The Court directs the parties to explore the possibilities for an amicable resolution of this case on a monthly basis, and the parties shall file a joint status report documenting their efforts within sixty days. Accordingly, it is

**ORDERED** that the Motion for Preliminary Injunction (Dkt.4) is **denied** as to the Bible History I curriculum, and is **granted** as to the Bible History II curriculum. The Request for Oral Argument (Dkt.5) is **denied**. The Court directs that a joint status report as to any monitoring activities which are undertaken be filed every sixty days.