Michael **CROSBY**

v.

Carolyn S. **HOLT, et al.**

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

Nov. 4, 2009 Session.

Dec. 28, 2009.

Permission to Appeal Denied by Supreme Court Aug. 25, 2010.

Robert L. Jolley, Jr., Knoxville, Tennessee, for the appellant, Michael Crosby.

H. Scott Reams, Morristown, Tennessee, for the appellees, Carolyn S. Holt, Charles Cross, Joe Gibson, Jr., Roger Greene, James Grigsby, Janice Haun, Clyde Kinder, members of the Hamblen County Board of Education, and Dale P. Lynch, Director of the Hamblen County Department of Education.

## OPINION

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and JOHN W. McCLARTY, J., joined.

Michael Crosby ("the Teacher"), a public school teacher, appealed his termination by the Hamblen County Board of Education ("the Board") to the trial court pursuant to Tenn.Code. Ann. § 49–5–513 (2009). The court upheld the discharge as "warranted on the grounds of unprofessional conduct and insubordination." The Teacher appeals. We affirm.

## I.

### A.

On March 16, 2007, Dale P. Lynch, Director of the Hamblen County Department of Education ("the Director"), recommended in a written memorandum that the Board immediately dismiss the Teacher based upon the statutory grounds of "unprofessional conduct and insubordination." *See* Tenn.Code Ann. § 49–5–511(a)(1) and (2) (2009) ("No teacher shall be dismissed or suspended except ... [for] incompetence, inefficiency, neglect of duty, unprofessional conduct [or] insubordination."). The memorandum included a factual background that related the recommendation to the Teacher's allegedly inappropriate relationship with a minor female student ("the Student"), emails sent over the school's system to a married female teacher, and allegedly inaccurate and misleading information the Teacher supplied to the Director during his investigation of the allegations. In a meeting held March 19, 2007, the Board dismissed the Teacher. Pursuant to the Teacher's request, the Board held an evidentiary hearing on May 9 and 10, 2007, to consider charges of "conduct unbecoming to a member of the teaching profession/unprofessional conduct and insubordination." After hearing evidence, the Board voted unanimously to sustain the dismissal, and the Teacher was given written notification of the Board's decision. The Teacher appealed to the trial court, which, according to the procedure established in Tenn.Code Ann. § 49–5–513, limited its review to the "written record of the hearing before the board," including exhibits. The court sustained the dismissal in a judgment that set forth specific findings of fact and conclusions of law. Those factual findings, paraphrased for the sake of brevity, are helpful to give this controversy context.

### B.

The Teacher's son reported that his father was having an inappropriate relationship with the Student, one of the son's female classmates. Upon receiving the report, the Director contacted the Student's parents. The parents made a formal complaint against the Teacher based on the latest report and a questionable history between the Teacher and the Student that dated back to 2005. The Director investigated the complaint. His investigation included three recorded and transcribed interviews with the Teacher.

The Teacher became acquainted with the Student in the fall of 2004 when she was a sophomore in his world geography class. He employed the Student in 2005, following which her parents forced her to quit when reports of a sexual relationship between her and the Teacher were made. The Student's father did not believe the reports and allowed her to resume working for the Teacher. When the allegations started a second time, the parents told the Student she could no longer work for the Teacher and that she was not to have any communication with him. The Teacher was aware of the parents' wishes. Nevertheless, the Teacher later employed the Student under the guise that she was working for his mother. She did clean house for the Teacher's mother, but she also cleaned the Teacher's house, which was situated very near his mother's. During this time, the Teacher left his door

unlocked so the Student could come and go without a key. In addition to housekeeping, she ran errands for the Teacher.

One specific area of the investigation that touched upon both the teacher-student relationship and the employer-employee relationship was the school's "job shadowing" program. The Student participated in the program in February 2005 and listed the Teacher as the employer she was "shadowing." The Teacher denied that he participated in the program in the year 2005 and claimed he would not have missed the opportunity for an easy day's work. However, personnel records indicated that the same day the Student had been out of school in the job shadowing program, February 4, 2005, the Teacher had taken leave from his regular classroom duties.

In this time frame, the Teacher resided in the backroom of his business. It was there that a male classmate of the Student reported seeing the Teacher and the Student hug and kiss on the lips.

The Teacher denied—as did the Student—that the relationship with the Student was sexual. However, four different classmates of the Student plus a teacher testified that the Student had told them that she was having sex with the Teacher.

The Teacher was also asked in the interviews with the Director about emails he had sent over the school computer network to Kelly Bowen, a married and apparently attractive female teacher at the same school where the Teacher worked. The school reserves the right to monitor all activity on its network and determine what is appropriate and what is not. Sexually oriented materials and messages are prohibited, as are obscenity and vulgarity. The Director testified that the emails to Bowen were offensive, defamatory and sexually suggestive. Bowen did not testify. The Teacher did not testify at the formal hearing but admitted in the interviews that he sent the emails. The Teacher denied, however, that the emails contained any offensive or sexually suggestive material.

During the investigation on February 9, 2007, the Director instructed the Teacher not to have any contact with the Student. On February 12, 2007, the Teacher took a phone call from the Student and advised her that she did not "legally" have to give the voice stress test being requested by police investigators.

C.

Notwithstanding the trial court's findings, some of the evidence needs additional perspective. One such area is the emails to Kelly Bowen. The chain of emails started off with an inquiry from the Teacher to Bowen about Sandy, a friend of Bowen, that the Teacher had dated briefly after being introduced by Bowen. Bowen replied to the inquiry by stating that "David [ (, my husband,) ] and I have had a few issues lately, and [Sandy has] been helping me work through those.... If you are curious about Sandy, she's fine and busy as usual." The Teacher's reply to the comment about "issues" with Bowen's spouse offered, "Let me know if I can lend a helping hand anywhere ... You know me you are the pick of the litter." To the comment about curiosity regarding Sandy, the Teacher responded, "I was just curious. More curious about you but curious nonetheless.... [Sandy] is one hottie (but nowhere in YOUR league of course)." The Teacher then mentioned his recent need for a date and stated:

I have my eye on that spec ed teacher from Kingsport or Crockett. Her room is near yours.... The only thing I hate is actually having an open relationship with a co-worker. Now if things could be kept hush hush I would be game.

See the delimna? ... Sandy ... is so smart. But crazy to some degree. She hates certain positions ... etc. You know.... LOL.

Let me know what you think. I hate to ask but you did so good last time. Sandy was a M LF. You did very well.... You know how to contact me. Don't be shy. I won't bite or anything. Like I said if I can help in anyway let me know.

When Bowen did not reply for a lengthy time, the Teacher sent a short email which included the following: "You know what I am doing right? Its nothing personal. LMK." Bowen replied with puzzlement as to what the Teacher was doing when he sent the email confessing that "[e]ither the blonde is really showing, or I have too many other things cluttering my mind. I thought you wanted to know about Sandy. What do you mean it's not personal?" The Teacher then got a little bolder in his innuendos and started his next email to Bowen by asking, "Does the carpet match the curtains? (Just a blonde joke)." As to the subject of what he was doing when he sent the earlier email, the Teacher stated

I wish I had the nerve to tell you. But I don't. I don't want to offend you.... Think deeper on the subject and reread the one big email I sent. It should be obvious. I'm not sure I have left enough hints.... Maybe I will get up the courage or you will figure it out. Think.

When asked about these emails in the interviews, and especially the last interview, the Teacher placed a remarkably innocent spin on them. "M LF," according to the Teacher, means a mother who looks fine. The question about the carpet matching the curtains supposedly had no meaning that the Teacher could remember. As to all the hints and discussion about what the Teacher was doing when he sent one of the emails, he had also reportedly forgotten. The talk about Sandy and "positions" supposedly referred to jobs.

The Director testified live at the hearing concerning his investigations and findings. He testified that the Teacher misled him in his investigation in numerous respects. The Teacher tried to deny knowing that the Student's parents did not want her working for him and why, but finally confessed in the third interview that he had been informed by the Student of her parents' wishes. The Teacher denied any sexual innuendos in the email messages, but the Director saw them as sexually suggestive. The Teacher denied any recall of whether he "job shadowed" the student and claimed that he would not have missed the opportunity for an easy day's work. On this subject, the Teacher was contradicted by the documentary evidence and also by the testimony of the Student. The Student, hard pressed to deny the written form, claimed that she stayed home with her mother's complete knowledge and permission during the daytime hours of job shadowing and completed the assignment during evening hours. The Student's mother, however, testified that the Student was not home during the daytime hours, but was obviously with the Teacher whom the mother had learned took leave the day of job shadowing. Also, the mother testified that in giving permission for her daughter to participate in job shadowing, she thought other students were going to be present and did not know that her daughter was going to have an opportunity to be alone with the Teacher.

The Student's mother also testified of being misled by the Student about working for the Teacher and his mother. The Student told her mother that she was working for the grandmother of a friend. The Student admitted as much at the hearing but

testified that she did not see it as any of her parents' business where she worked. The Student's mother also testified that her daughter retaliated against their resistance to the Teacher by calling the Tennessee Department of Children's Services on them and reporting mental abuse.

At the time of the hearing, the Student was completely estranged from her parents. She moved out of their home a few days after her eighteenth birthday, and moved into the home of the Teacher's mother. The Student claimed to be paying rent, but always in cash and she had never received a receipt.

As previously noted, given that both the Teacher and the Student denied a sexual relationship, most of the testimony that their relationship was sexual in nature came in through classmates of the Student or teachers at the school who stated, in essence, that the Student told them she was having sex with the Teacher. The first such witness was a female friend of the Student who, after hearing rumors, "asked [the Student] point blank if she had sex with him, and she said yes." The female friend remembered the approximate time and the exact place of their conversation.

It was during the friend's testimony that counsel for the Teacher launched a volley of objections to what he regarded as attempts to impeach the Student with hearsay testimony. Numerous objections were overruled on the advice of acting counsel for the Board who advised that the Tennessee Rules of Evidence do not apply to administrative proceedings and that the Board should treat the objections as continuing and allow the evidence to come into the record for such weight as the Board saw fit to assign to it. One such objection prompted the following exchange:

[Counsel for the Board]: First, I'm going to respond to a question I just received from a member of the Board, which is could we have counsel removed. And the answer is yes. This hearing may continue without … his presence, and the Board can make that decision without the attorney present.

[Counsel for the Teacher]: And if the advice from counsel for the Board is aware that person's are required to object to proceedings before they come in because the appellate courts have said that issues are waived, that means given up, it they are not objected to in these proceedings.

[Counsel for the Board]: I think you've already made a number of blanket objections very clear. And I have advised the Board that that may continue. This meeting can also be adjourned right now by the Board, and I can advise the Board to adjourn this meeting if that's most appropriate. I think your objection has been duly noted a blanket objection to what you consider hearsay. And my advice to the Board has been repeatedly, and I think you are very clear on it, the Rules of Evidence do not apply. And I have advised the Board to build a record.

Counsel for the Teacher was allowed to remain in the hearing room. The Board continued to completion and counsel continued to object, though in somewhat of a less interrupting manner than with the first classmate witness.

The next student witness was a male classmate who testified that the Student told him she "had a steady sexual relationship with [the Teacher]." The one difference in this male classmate's testimony was that he was able to testify of seeing physical contact between the Student and the Teacher that they both denied. The male classmate testified of driving the Student to meet a couple of friends when she asked to stop by the Teacher's place of

business. According to the witness, the Student went into the backroom of the structure, where the Teacher resided. The witness became impatient and walked toward the backroom. It was then that he saw the Student and the Teacher hugging and kissing on the lips.

The Student's ex-boyfriend testified also. He stated that he terminated his relationship with the Student after she told him she had a sexual relationship with the Teacher.

The Student's "best friend"—as that relationship existed at one point in time—was called as a witness. She testified that the Student told her about escalating feelings for the Teacher that resulted in a sexual relationship. She did not find out any details because she did not want to know.

Ann Huckaby, a teacher for 40 years, testified that she had counseled with the Student. First, the Student denied a sexual relationship. Later, when very apparently distraught over the Teacher's situation, the Student admitted to Huckaby that the relationship was sexual in nature.

### D.

Based on the trial court's factual findings, it reached the following legal conclusions which we will repeat verbatim, except for deletion of paragraph numbers and record citations:

> The notice of charges sent to [the Teacher] by Director Lynch are "sufficient in substance and form to fairly apprise [the Teacher] of the charge against him and enable him to prepare his defense in advance of the hearing." Legal sufficiency of the notice is further supported by the fact that [the Teacher] was interviewed on February 9 and 21, 2007, concerning the allegations and concerns of the child's parents, in the presence of [the Teacher's] TEA representa-
>
> tive, and a third interview on March 12, 2007 in the presence of his able counsel. The relationship between [the Teacher and the Student] was inappropriate and exposed the [S]tudent to embarrassment and disparagement. [The Teacher] failed to take reasonable efforts to protect the [S]tudent from conditions which were harmful to her health and safety. [The Teacher's] conduct constitutes a violation of the Code of Ethics of the Tennessee Education Association and as such is conduct unbecoming a member of the teaching profession as defined by T.C.A. § 49–5–501(3).
>
> The series of emails sent by [the Teacher] to Kelly Bowen did not violate the Board of Education policies and does not constitute insubordination within the meaning of T.C.A. § 49–5–501(7). The communications in issue were [the Teacher's] private communications with co-workers made on his own personal time. Although made on the school's computer system, the content of the e-mails was not disruptive. There is no proof that [the Teacher's] e-mails adversely affected the recipient's performance or the harmony of the workplace. The recipient, who did not testify in these proceedings, did not complain about receiving the e-mails, but instead participated and responded freely.
>
> [The Teacher's] advising [the Student] that she did not have to take a voice stress analysis test after being instructed by Dr. Lynch not to have further contact with [the Student] constitutes insubordination within the meaning of T.C.A. § 49–5–501(7)(A).
>
> [The Teacher's] denial of his involvement in the job shadowing program during interviews with Dr. Lynch during the course of Dr. Lynch's investigation was false, misleading, and dishonest, and, as such, is both insubordinate and

conduct unbecoming to a member of the teaching profession.

The record of testimony by [the Student] is contradicted by the record of testimony of Male Student No. 3 that he observed [the Teacher and the Student] embracing and kissing. Further, [the Student] told Ms. Huckaby [and four classmates] that there was a sexual relationship between her and [the Teacher].

The dismissal of [the Teacher] is warranted on the grounds of unprofessional conduct and insubordination.

## II.

The Teacher raises the following issues on appeal:

Whether the evidence admitted and the conduct attributed to [the Teacher] justified his termination on the grounds of insubordination.

Whether the evidence admitted and the conduct attributed to [the Teacher] justified his termination on grounds of unprofessional conduct.

Whether the decision of the Board to terminate [the Teacher] was arbitrary, capricious, and unsupported by reasonable grounds.

Whether [the Teacher] was afforded due process under the Tennessee Constitution and the Tennessee Teacher Tenure Act.

a. Whether [the Teacher] received notice sufficient in substance and form to fairly apprise him of the charges against him and enable him to prepare his defense in advance of the hearing.

b. Whether the Board erroneously admitted and relied upon inadmissible and unreliable hearsay evidence.

c. Whether the Board violated [the Teacher's] right to have representation by threatening to remove his counsel during the hearing.

d. Whether [the Teacher] received a full, complete and impartial hearing before the Board.

Whether the Board's termination of [the Teacher] violated his rights of freedom of speech, freedom of religion, and freedom of association as guaranteed under the United States and Tennessee Constitutions.

## III.

■■■ Our review of constitutional and other such legal issues that arise during administrative proceedings is *de novo*. *See Richardson v. Tenn. Bd. of Dentistry*, 913 S.W.2d 446, 458 (Tenn.1995)(trial court can take proof and determine constitutional issues). Otherwise, judicial review of the administrative termination of a teacher is limited as stated in *Ripley v. Anderson County Bd. of Educ.*, 293 S.W.3d 154, 156 (Tenn.Ct.App.2008).

Tennessee Code Annotated § 49–5–513 affords a tenured teacher whose employment has been terminated by a school board the right to chancery court review of the school board's decision. The chancery court's review, as contemplated by this statute, is a *de novo* review wherein the chancery court does not attach a presumption of correctness to the school board's findings of fact, nor is it confined to deciding whether the evidence preponderates in favor of the school board's determination. *Lee v. Franklin Special Sch. Dist. Bd. of Educ.*, 237 S.W.3d 322, 329 (Tenn.Ct. App.2007). Upon appeal to our Court in a non-jury case such as this one, we review the record *de novo* with a presumption of correctness as to the trial court's determination of facts, and we must honor those findings unless the evidence preponderates to the contrary. Tenn. R.App. P. 13(d); *Union Carbide*

v. Huddleston, 854 S.W.2d 87, 91 (Tenn. 1993).

*Id.* On the question of whether the school board acted illegally or arbitrarily and capriciously, the trial court may take new evidence and make independent findings. *Winkler v. Tipton County Bd. of Educ.*, 63 S.W.3d 376, 381 (Tenn.Ct.App.2001). It is presumed that the actions of school boards are reasonable, and therefore not arbitrary and capricious, unless there is clear evidence to the contrary. *Childs v. Roane County Board of Educ.*, 929 S.W.2d 364, 365 (Tenn.Ct.App.1996). Even if there is a procedural irregularity, unless it is flagrant or prejudicial, we will not interfere with the actions of the school board. *Id.* at 367.

## IV.

### A.

■■ We begin with the procedural issues and work our way toward the constitutional issues. The Teacher admits he received a copy of the March 16, 2007, memorandum provided to the Board, but argues that "the notice was insufficient to give [the Teacher] clear and adequate notice of every issue under consideration by the Board." Specifically, the Teacher argues three deficiencies, *i.e.*, failure to identify the student with whom he allegedly had a sexual relationship, failure to identify the witnesses who had been told by the Student that she had a sexual relationship with the Teacher, and failure to identify the allegedly "inaccurate and misleading information" that the Teacher furnished to the Director. All that is required is that the notice be "sufficient in substance and form to fairly apprise the teacher of the charge against him and enable him to prepare his defense in advance of the hearing." *Potts v. Gibson*, 225 Tenn. 321, 469 S.W.2d 130, 133 (1971).

We agree completely with the trial court's reasoning on this issue, *i.e.*, that the detailed memorandum and the interviews conducted well in advance of the hearing adequately informed the Teacher of the conduct at issue. In the very first interview, the identity of the Student was the first thing mentioned. In another, the parents of the Student were present. As to the student and teacher witnesses, it is clear from the interviews that the Teacher had been questioned by the police in 2005 and knew the identity of some, if not all, of the witnesses. Further, by the time of the last interview, the Teacher knew the substance, if not the source, of the testimony. In fact, the initial memorandum of the Director states that the Student had confided in a number of other students and teachers. It also appears that, by the date of the hearing, the Teacher had free access to the Student who resided with his mother and he would have been able to ask her about statements made to classmates and other teachers. Even before the formal hearing, it is clear the Student and the Teacher were discussing the investigation because the Teacher told the Student that she did not have to undergo a voice stress test. We also note that counsel for the Teacher had apparently tried to interview some if not all of the witness, because he cross-examined them as to why they would not take questions from his investigator. As to the false statements, all that was necessary was to read the transcript of the interviews to see areas fertile for matters raising the specter of a lack of credibility.

■ In his reply brief, counsel for the Teacher makes the slightly different argument that the Board did not make actual findings and a decision as required by Tenn.Code Ann. § 49–5–512. The Teacher relies on *Winkler*, 63 S.W.3d at 382. *Winkler* is different than the present case. The charges brought against the teacher

in *Winkler* involved conversion and inappropriate handling of money. *Id.* at 377. At the end of the proof in *Winkler*, one board member expressed serious doubts about whether the teacher had done anything wrong other than exercise poor judgment and made a motion that the teacher be suspended rather than terminated. That motion passed. *Id.* at 380. On appeal this court suggested that a finding of guilt would seem inherent in the punishment of suspension, but such a finding was belied by the discussion and the alternative motion. *Id.* at 382. Accordingly, we held that the school board's action did not comply with the requirement that the board make known to the teacher in writing its "findings and decision." *Id.* In the present case, there was no equivocation. The vote to uphold the termination was unanimous. The charges were identified and the decision was provided in writing. Accordingly, we hold that the notice of charges as outlined in the March 16, 2007, memorandum from the Director to the Board, as supplemented by the interviews of the Teacher, were sufficient to allow him to prepare his defense. Further, we hold that the findings and decision were legally sufficient under Tenn.Code Ann. § 49–5–512.

■ Next, the Teacher challenges the introduction of hearsay evidence of classmates and teacher Huckaby. The Teacher acknowledges that hearsay is admissible in an administrative hearing if (1) it is the type of material commonly relied upon by reasonably prudent persons in the conduct of their affairs and (2) it is corroborated and not the sole evidence of the act. *See* Tenn.Code Ann. § 4–5–313(1) (2005); *Green v. Neeley*, No. M2006–00481–COA–

R3–CV, 2007 WL 1731726 at *5 (Tenn. Ct.App. M.S., filed June 15, 2007). We believe that prudent members of a board charged with administering the activities of a school and the relationships between its teachers and students would necessarily rely on reports of students and teachers, especially as to matters where the participants in the challenged conduct have a strong incentive and ability to cover their incriminating tracks. We agree that administrative hearings, no less than trials, involve a search for the truth, but we think this type of information, used advisedly, is a tool that can be utilized in the administrative search for the truth. Further, we agree with the Board that there was corroborating evidence from one student who testified that he saw the Teacher and the Student hugging and kissing at the Teacher's residence in the back of his business.[1] Also, we believe there is other corroborating circumstantial evidence as we will discuss in more detail later. Given corroborating evidence, the testimony was admissible as substantive evidence of sexual activity between the Teacher and the Student. The Teacher's argument that the hearsay was improper impeachment by inconsistent statements therefore rings hollow.

■ Another procedural argument that the Teacher makes is that the "threat to remove counsel had a chilling effect on Mr. Crosby's statutory right to be represented by effective counsel at his dismissal hearing." The Teacher gives no particulars about how his representation was adversely affected and furnishes no law for the proposition that a discussion such as occurred at the Board hearing is grounds for reversal of an administrative action. We

---

1. The Teacher argues that he should have been given advance notice of this student's testimony, but, the student testified that he told no-one about the incident until two days before his testimony to the Board. He provided the information to counsel for the defendants at that time. The student's testimony was within the scope of the charges.

have previously observed that counsel was not removed and continued to participate and object. In the absence of any authority, particulars, or mention of specific prejudice, we are unable to find prejudicial error.

The final pure procedural argument made by the Teacher is that the Board made up its mind in its initial discussion and vote to discharge him before the formal hearing, and that nothing done or said in the hearing was going to change the mind of any board member. The Teacher acknowledges, as he must, that according to our Supreme Court, "the mere fact that both investigative and adjudicative functions have been granted to an administrative body ... does not of itself create an unconstitutional risk of bias in an administrative adjudication." *Cooper v. Williamson County Bd. of Educ.*, 803 S.W.2d 200, 202–03 (Tenn.1990). We note that the Teacher had the opportunity to develop and present proof of his assertion to the trial court but did not do so. *See Winkler*, 63 S.W.3d at 381 (trial court may hear new evidence as to whether the decision of the board was arbitrary, capricious or illegal). Since Teacher's charge that the Board made up its mind before the formal hearing is unsupported speculation, this is not the case for finding an exception. Accordingly, we must presume that the Board fulfilled its duties and hold that the Teacher received a full, complete and impartial hearing. *See Cooper*, 803 S.W.2d at 203.

We turn now to the various arguments concerning the sufficiency of the proof of unprofessional conduct and insubordination. We believe there was a preponderance of evidence of both, but our approach is a little more direct than that of the trial court. There was compelling proof, albeit largely circumstantial, of a sexual relationship between the Student and the Teacher. It must be understood that we are not, unless required by a higher court, willing to impose a requirement on school boards that they must catch the participants in the act before they can administratively find a teacher guilty of sexual misconduct. There was evidence in this case that the Student was present with the Teacher alone for a long period of time on job shadow day. There was proof that they both tried to shade the facts to cover up their time alone. There was evidence that in the very place where they did their shadowing, they were seen hugging and kissing by one of the Student's classmates. There was evidence that after the parents made the Student quit working for the Teacher, or so they thought, she or the Teacher or both found a way for her to frequent the Teacher's residence and business against the wishes of the parents and without their knowledge. Again, there was a misrepresentation to cover up the true facts. It was the Student that made the representation, but, under the circumstances, the Teacher was complicit in the misrepresentation. Also, we are unwilling to place an innocent characterization on the phone conversation between the Teacher and the Student even after he had been instructed and agreed that he would have no contact with the Student. It was not likely pure innocence or a desire to keep the local police force in check that led him to tell her that she did not have to undergo a voice stress analysis. We believe it is much more likely that he was trying in the phone call as he had in other ways to keep his true relationship with the Student from being discovered. Further, we are not convinced that it is pure circumstance and simply a strong student-teacher bond that led the Student to be estranged from her parents and take up residence at the home of the Teacher's mother.

■ While we are on the subject of the Teacher's credibility, we will briefly discuss his emails to a fellow teacher, Kelly Bowen. We do not disagree with the trial court completely, but we do believe that the emails to Bowen were sexually charged and suggestive and that his denials are unbelievable. The question to Bowen, "[d]oes the carpet match the curtains," carries a sexual connotation that we need not explain. References to Bowen's friend Sandy as a "M LF" and references to "positions" that Sandy would not consider that caused the Teacher to "LOL," or laugh out loud, were also suggestive. Finally, we think it unlikely that what the Teacher was doing when he sent the emails to Bowen was innocent and easily forgotten in light of the statements he made at the time. He referred to his actions as being "obvious" and fully revealed by "hints" but something that she could find offensive and that he did not have the courage to say directly. More importantly, we think the Teacher's explanation of the meaning of these emails, and his denial of a recollection, added to the preponderance of evidence that he was being deliberately false, misleading and dishonest in complete disregard for the investigation. He appears to have decided that the whole investigation was trivial and that he did not need to tell the truth.

Other than as we have discussed above, we fully concur in the trial court's findings and hold that the evidence preponderates in favor of a finding that the Teacher was guilty of insubordination and unprofessional conduct. The Teacher's argument that the decision of the Board is arbitrary and capricious is based solely on the proposition that "the Board's termination … was unsupported by material evidence." It was the Teacher's burden to prove that the Board acted illegally, arbitrarily of capriciously. *Warren v. Polk County Bd. of Educ.*, 613 S.W.2d 222, 225 (Tenn.1981). Since we have rejected those arguments, and it should be fairly obvious from our discussion that we concur in the Board's findings, we likewise reject the argument that its findings and actions were arbitrary and capricious.

■ The final argument advanced by the Teacher is that the Board took into consideration the Teacher's atheism in violation of his right to freedom of religion and that by firing him for refusing to discontinue his "non-sexual" association with the Student, the Board violated his freedom to associate outside school hours. We have rejected the notion that this was not proven to be a sexual relationship. We think it beyond the realm of reasonable argument that a school can instruct a teacher to discontinue a sexual relationship with a minor student. Moreover, the Teacher offers no authority for the proposition that a school may not interfere with non-sexual association between a student and a teacher based on concerns of parents, even if the concerns are exaggerated.[2] Accordingly, we hold that the Teacher's rights of association were not violated.

The claim of religious discrimination is based on testimony concerning a pair of earrings alleged by the Director in his initial memorandum to be "gifts" from the Teacher to the Student that were "contrary to the parents' teaching and upbringing of their child." During the hearing, the Director testified that the parents viewed the earrings as "atheist earrings." Also, the Student's mother testified that her daughter balked at the idea of a family prayer saying, "I'm not giving thanks for a

---

2. We are not saying the concerns of this Student's parents were exaggerated. They were not.

F-ing thing.... I'm atheist." Some limited mention of this "gift," which the Teacher claimed the Student paid for out of her earnings, was appropriate to allow the Board to consider whether it was in fact paid for by the Student or another falsehood offered by the Teacher to cover up his affections for the Student. Also, our perception of the import of the testimony is, not surprisingly, much different from the perception argued for by the Teacher. We believe it was intended and relevant to show the Teacher's disregard, to the point of disdain, for the wishes of the parents. While the Teacher has some rights even in the school environment to his own freedom of religion, that right does not include the freedom to impose his religious beliefs on students just to spite parents. *Wiley v. Franklin,* 468 F.Supp. 133, 150 (E.D.Tenn.1979)(teachers must refrain from imposing their beliefs on students—parents have standing to challenge such actions). That would be unprofessional, which was the point of the hearing. We hold that the brief mention of "atheist earrings" and the Student's newly found atheist beliefs during the hearing did not violate the Teacher's freedom of religion. The same is true of the questions posed to the Teacher during the investigation. We hasten to add that the Teacher has now received two levels of judicial review, neither of which considered his religious beliefs, or lack thereof, in upholding his termination. *See Cooper,* 803 S.W.2d at 203 (any impropriety cured by *de novo* judicial review).

### V.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, Michael Crosby. The case is remanded, pursuant to applicable law, for collection of costs assessed below.